Bingham McCutchen LLP
JAMES G. SNELL (SBN 173070)
CHRISTOPHER M. O'CONNOR (SBN 229576)
ANDREW B. ELLSWORTH (SBN 240176)
1900 University Avenue
East Palo Alto, CA 94303-2223
Telephone: (650) 849-4400
Facsimile: (650) 849-4800

Attorneys for Defendant
Quicken Loans Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASIS INTERNET SERVICES, a California Corporation,<br><br>             Plaintiff,<br><br>v.<br><br>OPTIN GLOBAL, INC., et al.,<br><br>             Defendants. | No. 3:05-CV-05124-CW<br><br>DECLARATION OF AMY BISHOP IN SUPPORT OF DEFENDANT QUICKEN LOANS INC.'S MOTION FOR SECURITY FOR COSTS INCLUDING ATTORNEYS FEES<br><br>Date:   April 21, 2006<br>Time:   10:00 a.m.<br>Place:  Courtroom 2 -- 4th Floor<br>Judge:  Honorable Claudia Wilken |

I, Amy Bishop, declare as follows under penalty of perjury:

1.  I am employed by defendant Quicken Loans Inc. as Associate Corporate Counsel. I have personal knowledge of the matters stated herein and if called as a witness could and would testify competently to the facts stated in this declaration.

2.  Quicken Loans is America's top online mortgage lender, with a 94% client satisfaction score. Quicken Loans is the preferred mortgage company for many of America's top companies, including AT&T, Google, Yahoo!, Compuware, EDS, and Penske. Quicken Loans has been ranked as one of the top place to work by Fortune, Computerworld Magazine, and the Michigan Business and Professional Association.

1    3.   Quicken Loans has policies and contractual provisions in place that
2 require that the companies it does business with comply with the CAN-SPAM Act and related
3 laws. Quicken Loans requires that the companies with whom it works comply with these
4 policies and contractual provisions.
5    4.   On November 1, 2005, Plaintiff's counsel Jason Singleton wrote to
6 Quicken Loans stating "my client wishes to provide Quicken Loans a complete release
7 agreement in exchange for Quicken Loans assistance in tracking down the flow of data from the
8 spammer to the online form web pages and finally to Quicken Loans." A true and correct copy
9 of this letter is attached as Exhibit A. I am informed and believe that this letter was sent after
10 Mr. Singleton called Andrew Lusk, Associate Corporate Counsel to Quicken Loans. I followed
11 up on the letter and had several conversations with Plaintiff's counsel Jason Singleton in an
12 attempt to cooperate with him and alleviate any concerns.
13    5.   I understand from Mr. Singleton that he or Plaintiff filled out an online
14 mortgage information request form using the phony name "Bruce Wolf," and that Plaintiff or Mr.
15 Singleton subsequently received a phone call from Quicken Loans offering mortgage services to
16 Bruce Wolf.
17    6.   The source of the Bruce Wolf lead came from a company that Quicken
18 Loans contracts with called Azoogle.com ("Azoogle"). In its contract with Quicken Loans,
19 Azoogle agrees to abide by Quicken Loans' privacy policy for companies with whom Quicken
20 Loans does business and that policy requires compliance with junk email and other applicable
21 laws. Moreover, in its contract with Quicken Loans, Azoogle "represents and warrants that it has
22 obtained any and all requisite consent from consumers to pass their information to [Quicken
23 Loans] as a Qualified Submission . . . "
24    7.   On November 2, 2005, I contacted Azoogle seeking information about the
25 Bruce Wolf mortgage inquiry lead. On November 3, I called Plaintiff's counsel Mr. Singleton
26 and explained that Quicken Loans was investigating the source of the lead. Mr. Singleton
27 threatened to sue Quicken Loans if it did not provide information about the lead.
28    8.   During telephone conversations on November 17 and 21, 2005,

2

DECLARATION OF AMY BISHOP IN SUPPORT OF MOTION FOR SECURITY FOR COSTS
PA/52179738.1

1  Mr. Singleton told me that either he or Plaintiff filled out the online mortgage information
2  request form on the USA Lenders Network's web site. I told Mr. Singleton that I had never
3  heard of USA Lenders Network and did not think that Quicken Loans had a business relationship
4  with USA Lenders Network. I later confirmed that Quicken Loans does not have a business
5  relationship with USA Lenders Network or any other named defendant. Subsequently, Mr.
6  Singleton provided me with sample copies of the online mortgage information forms which I was
7  led to believe are or were used on the USA Lenders Network website. On each sample online
8  mortgage information request form provided by Mr. Singleton, the form itself discloses that the
9  request for information by the user is voluntary and that a mortgage lender will be contacting the
10 website user as a follow-up to the user's request for information.

11         9.      On or about December 14, 2005, I spoke with Mr. Singleton and informed
12 him that I had received all the information I could expect to get about the source of the Bruce
13 Wolf mortgage inquiry lead. Since Mr. Singleton had threatened a lawsuit and offered a release
14 to Quicken Loans in exchange for information, I told Mr. Singleton words to the effect that "it is
15 understood that the release of this information to you is conditioned upon you releasing Quicken
16 Loans." Mr. Singleton agreed to release Quicken Loans in exchange for the information. Mr.
17 Singleton did not tell me that he had filed a lawsuit against Quicken Loans two days earlier, but
18 instead asked me to cooperate by providing the information I had.

19         10.     Relying on the release, I then explained to Mr. Singleton that Quicken
20 Loans received the lead from its affiliate, Azoogle, and that Azoogle had apparently received the
21 lead from John Strothers (with whom Quicken Loans had no relationship). I also told Mr.
22 Singleton that I understood Azoogle severed its relationship with Mr. Strothers after Mr.
23 Strothers did not respond to Azoogle's repeated requests for information concerning the Bruce
24 Wolf mortgage inquiry. Mr. Singleton thanked me and promised to send me a written release to
25 memorialize the oral agreement.

26         11.     On December 20, 2005, Quicken Loans received a copy of a partial
27 release agreement from Mr. Singleton's office via email. A true and correct copy of this
28 agreement is attached as Exhibit B. The release was missing the last pages but the sent portion

addressed the consideration exchanged. I note that the language of this agreement requires nothing further from Quicken Loans in exchange for the release. I also note that the cover page thanks Quicken Loans for its "attention and assistance in this matter" and states "[u]pon execution of the Release, we will also file a Dismissal with the Court dismissing Quicken Loans from the action." The draft agreement confirms the release of Quicken Loans for "good and sufficient consideration, the receipt of which is hereby acknowledged." I called Mr. Singleton's office and spoke with Roberta Alliston who promised to send the full copy of the release.

12. Two days later, Ms. Alliston forwarded to me a different release along with a copy of the complaint. True and correct copies of these documents are attached as Exhibit C. The new release purported to require Quicken Loans to provide further information to Plaintiff. This was not what I had agreed to with Mr. Singleton. Nevertheless, Quicken Loans was willing to modify the earlier oral agreement and I made some minor changes to the release and emailed the revised version to Mr. Singleton's office on December 23, 2005. A true and correct version of the revised agreement is attached as Exhibit D.

13. On January 5, 2006, having heard nothing from Mr. Singleton, I emailed Ms. Alliston, inquiring into the status of the release agreement. Ms. Alliston told me to call Mr. Singleton directly, which I did. After exchanging several voicemails, I finally spoke with Mr. Singleton on January 12, 2006. Mr. Singleton informed me that Plaintiff was no longer willing to release Quicken Loans. He proceeded to tell me that he had received "better information" from another source, that he was "tired" of dealing with Quicken Loans, and that Quicken Loans' revisions to the agreement were "unacceptable." When I reminded Mr. Singleton that he verbally agreed to the release, he replied "try to enforce a verbal agreement."

14. I have reviewed internal records from Quicken Loans regarding communications with Plaintiff's domain "asis.com" and have learned that Quicken Loans communicated with nine different email addresses (including the Bruce Wolf lead) over the past six years. Two of those addresses are associated with people who closed loans with Quicken Loans, two received emails prior to the enactment of the CAN-SPAM Act or the California junk email law, and five received emails from Quicken Loans in response to what Quicken Loans

4

DECLARATION OF AMY BISHOP IN SUPPORT OF MOTION FOR SECURITY FOR COSTS

PA/52179738.1

1 thought was an affirmative request for information and those emails offered ways for the
2 recipient to decline further communication from Quicken Loans. No one with an "asis.com"
3 email address has asked to opt-out from receiving information from Quicken Loans.
4
5       I declare under penalty of perjury that the foregoing is true and correct. This
6 declaration is executed on March 17, 2006.
7
8       _____
9       Amy Bishop
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5

DECLARATION OF AMY BISHOP IN SUPPORT OF MOTION FOR SECURITY FOR COSTS

PA/52179738.1