1  Jason K. Singleton, State Bar #166170
   lawgroup@sbcglobal.net
2  Richard E. Grabowski, State Bar #236207
   rgrabows@pacbell.net
3  SINGLETON LAW GROUP
   611 "L" Street, Suite A
4  Eureka, CA 95501
   (707) 441-1177
5  FAX  441-1533

6  Attorneys for Plaintiff, ASIS Internet Services

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10  ASIS INTERNET SERVICES, a California  )  Case No. C-05-5124 JCS
    corporation,                          )
11                                        )  PLAINTIFF'S MOTION FOR SUMMARY
                                          )  AJUDICATION OF ISSUES
12         Plaintiff,                      )
    vs.                                   )
13                                        )  DATE: May 4, 2007
    OPTIN GLOBAL, INC., a Delaware        )  TIME:  9:30 A.M.
14  Corporation, also dba Vision Media    )  CTRM: A, 15TH FLOOR
    Limited Corp., USA Lenders Network,   )
15  USA Lenders, and USA Debt             )
    Consolidation Service; et al.,        )
16                                        )
                                          )
17         Defendants.                    )

18

19

20

21

22

23

24

25

26

27

28



## TABLE OF CONTENTS

INTRODUCTION.......................................................................................................1

STATEMENT OF FACTS...........................................................................................3

ARGUMENT .............................................................................................................8

1.   Legal standard for summary adjudication of discovery issues..................8

2.   Plaintiff's request for information about affiliates is consistent with the
     language of the CAN SPAM Act...........................................................9

     a.   Plaintiff's Prima Facie case...............................................................9

     b.   Defendant is connected to the emails by the "Bruce Wolf" lead.......12

     c.   All of the emails can be linked to Defendant.....................................13

     d.   Defendant's contention that they did not send or procure the
          sending of the emails is not sound. .................................................14

     e.   The term "procure" was intended to include affiliates and proof
          of control of affiliates is part of the process envisioned by the
          legislature. .....................................................................................15

     f.   Evidence of pattern and practice is applicable to the CAN SPAM
          Act and is admissible under FRE 404(b).........................................16

3.   The definition of advertise as used in California Business and Professions
     Code and California law support discovery of information based on the
     emails at issue in this case.......................................................................17

4.   Defendant has waived all objections by their untimely responses to
     Plaintiff's Rogs and RFPs. ........................................................................21

CONCLUSION ........................................................................................................22

# TABLE OF AUTHORITIES

Cases

Biggins v. Oltmer Iron Works, 154 F.2d 214 at 217 (7th Cir. 1946) ........................................ 9
Botosan v. Paul McNally Realty, 216 F.3d 827 at 831 (9th Cir., 2000) .................................. 21
Davis v. Fendler, 650 F.2d 1154 at 1160 (9th Cir., 1981) ..................................................... 21
Dosier v. Miami Valley Broadcasting Corp., 656 F.2d 1295 at 1300 (9th Cir., 1981) ......... 17
Hypertouch, Inc. v. Kennedy-Western University, Not Reported in F.Supp.2d, 2006 WL
    648688 (N.D.Cal.,2006) ...................................................................................................... 10
Leonard v. Socony-Vacuum Oil Co., 130 F.2d 535 at 536 (7th Cir., 1942) ............................ 9
Molski v. M.J. Cable, Inc., --- F.3d ----, 2007 WL 865532 at 7 (9th Cir.,2007) ..................... 21
Peat, Marwick, Mitchell & Co. v. West, 748 F.2d 540 at 542 (10th Cir.,1984) ..................... 22
People v. McKean, (1925) 76 Cal.App. 114 at 131 [243 P. 898] .......................................... 19
Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468 at 1473 (9th Cir.,1992) ..... 21
Safeco Ins. Co. of America v. Rawstrom, 183 F.R.D. 668 at FN1 (C.D.Cal.,1998) .............. 22

Statutes

15 USC 7701 ........................................................................................................................... 1
15 USC 7702(12) ............................................................................................................ passim
15 USC 7702(2) ..................................................................................................................... 11
15 USC 7702(9) ................................................................................................................. 3, 10
15 USC 7704(a) ..................................................................................................................... 11
15 USC 7704(a)(1) ........................................................................................................... 10, 11
15 USC 7704(a)(2) ................................................................................................................ 10
15 USC 7704(a)(2), (3), (4), or (5) ................................................................................... 10, 16
15 USC 7704(b) ..................................................................................................................... 10
15 USC 7704(b)(1) .......................................................................................................... 10, 11
15 USC 7704(b)(2) .......................................................................................................... 10, 11
15 USC 7704(d) ..................................................................................................................... 10
15 USC 7706(g) .................................................................................................. 1, 11, 15, 16
15 USC 7706(g)(1) .............................................................................................................. 8, 16
15 USC 7706(g)(2) ......................................................................................................... passim
15 USC 7706(g)(3)(C)(ii) ..................................................................................................... 11
California Business and Professions Code §17529(k) ......................................................... 19
California Business and Professions Code §17529.1(c) .................................................. 19, 20
California Business and Professions Code §17529.5 ................................................. 1, 3, 15, 18
CAN SPAM Act ............................................................................................................... passim

Rules

FRCP Rule 26(b)(1) .............................................................................................................. 2, 9
FRCP Rule 33(b)(4) ............................................................................................................... 21
FRCP Rule 34 ....................................................................................................................... 21
FRCP Rule 56 ......................................................................................................................... 8
FRCP Rule 56(d) ................................................................................................................... 8
FRE 401 ................................................................................................................................. 9
FRE 404(b) ..................................................................................................................... 16, 17

## INTRODUCTION

Plaintiff **ASIS INTERNET SERVICES** ("Plaintiff") submits this motion to the court for Summary Adjudication of certain issues defining the scope of discovery in this action.

A difference of opinion has arisen between the parties as to the legal limitations of what interrogatories, production of documents, and depositions may be demanded under the causes of action brought by Plaintiff for violations of the **CAN SPAM Act** and **California Business and Professions Code** §17529.5.

The parties are in disagreement as to the following issues:

1.     Whether the following types of evidence are discoverable/admissible on the question of whether a defendant who contends that they did not directly transmit emails in violation of the **CAN SPAM Act** and **California Business and Professions Code** §17529.5 can be forced to produce evidence regarding whether they procured the sending of those emails within the meaning **15 USC** 7702(12) and **15 USC** 7706(g):

    A.      Evidence that Defendant has a reputation for initiating commercial electronic emails in violation of the **CAN SPAM Act**. **15 USC** 7701 et. seq.

    B.      Evidence that third parties in privity with the Defendants in relation to internet marketing activities have a reputation for initiating commercial electronic emails in violation of the **CAN SPAM Act**. **15 USC** 7701 et. seq.

    C.      Whether Defendant has initiated commercial electronic mail messages, other than those at issue, in violation of the **CAN SPAM Act**. **15 USC** 7701 et. seq.

    D.      Evidence that third parties in privity with the Defendants in relation to internet marketing activities have initiated commercial electronic mail messages, other than those at issue, in violation of the **CAN SPAM Act**. **15 USC** 7701 et. seq.

2.     Whether a defendant can be said to advertise within the meaning of **California Business and Professions Code** §17529.5, in a commercial email advertisement that neither mentions or references the defendant or any third party in privity with the defendant, nor any property, goods, services, or extensions of credit as specifically offered by the defendant or any third party in privity with the defendant.

1   Plaintiff has decided to change the language of the first issue to resolve the issue of
2   whether the information is discoverable, not whether it is admissible. Evidence does not have
3   to be admissible to be discoverable. "Relevant information need not be admissible at the trial if
4   the discovery appears reasonably calculated to lead to the discovery of admissible evidence."
5   **FRCP Rule** 26(b)(1).   Since whether the information is admissible also turns on several
6   complex issues, such as more probative than prejudicial, it is not appropriate to determine this
7   issue at this early stage of discovery.

8   Plaintiff has also changed the language, from the stipulation, as to whether defendant
9   has actually sent the emails. This is still a contested issue and is only a claim by Defendant at
10   this point. Plaintiff is continuing discovery, in part to verify this fact. Plaintiff is in the process of
11   conducting a test against its spam data base to determine if emails were received directly from
12   any domain name owned by Azoogleads, based on recently received subpoena information
13   from Dotster.com. Plaintiff also maintains that the incident period for emails in violation brought
14   in this case is still open. Therefore, Plaintiff continues to search its data base of spam for
15   additional emails that meet the criteria of this case.

16   Plaintiff also must point out that Issue two contains an assumption that has not been
17   verified. That is, whether the third parties mentioned in the emails are or are not in privity with
18   Defendant. Defendant has refused in their responses to Plaintiff's discovery requests for
19   information as to what affiliates they have contracts with, other than the affiliates providing the
20   "Bruce Wolf" lead. There is no evidence that the two affiliates named are not "USA Lenders
21   Network" as described in the web pages to which the emails directed the recipients. Defendant
22   has also not answered Plaintiff's Request for Admissions Nos. 40-43 stating that after
23   reasonable inquiry the information is insufficient to answer. These requests specifically ask for
24   information about Defendants OPTIN GLOBAL, Vision Media, Rick Yang, and Peonie Pui Ting
25   Chen. Therefore, it is still an issue for discovery as to whether Defendant was in privity with
26   parties named in the emails. In fact, one of the reasons Plaintiff wants Defendant's list of
27   affiliates is to verify this fact against the data contained in the emails.

28   ///

## STATEMENT OF FACTS

Plaintiff made its Complaint after suffering injury by a group of Defendants who intended to misuse its Internet service resources to gain information about its clients and sell mortgages to its clients. (Plaintiff's Second Amended Complaint (hereafter "SAC")). These actions directly violated various parts of the **CAN SPAM Act** of 2003 and **California Business and Professions Code** § 17529.5 that prohibit sending certain types of commercial emails that meet specific conditions.

Plaintiff has made settlements and released all of the Defendants in this case other than Defendant Azoogleads and Defendant Leads Limited.   Defendant Leads Limited did not respond to Plaintiff's Complaint and Plaintiff has moved to take Leads Limited default.

Plaintiff contends that Defendant Azoogleads was the entity that was responsible for inducing the actual spammers to send emails to Plaintiff's protected computer. Defendant then benefited by selling the leads they gained to a group of mortgage brokers.

Plaintiff has been unable to identify the actual spammers in this case.  That is not an unusual incident since the nature of violations of the **CAN SPAM Act** of 2003 and **California Business and Professions Code** § 17529.5 is that the emails contain false header information.  The use of false header information is used to mask the identity of the true sender, making it virtually impossible to identify the sender solely on the basis of the data contained in the emails.

> "FTC Chairman Muris and Commissioners Swindle and Thompson each testified in hearings before the Committee this past spring to the FTC's tremendous difficulty in tracking and finding spammers who send out spam with fraudulent transmission information. In response to members who questioned the FTC's effectiveness in reducing the volume of spam, Chairman Muris testified that their investigations are more effective when "following the money" through the business promoted in the e-mail message to the spammer." **S. REP. 108-102, S. Rep. No. 102, 108TH Cong., 1ST Sess. 2003, 2004 U.S.C.C.A.N. 2348, July 16, 2003.**

Congress addressed this problem by attaching liability to an entity who procures the services of another to send spam on their behalf.  **15 USC 7702**(9) and (12); and **15 USC 7706**(g)(2).  This is therefore one of the key issues in the discovery process.  Did Defendant

1  Azoogleads procure the sending of the emails?

2       During the months of October and November of 2005, plaintiff received in excess of

3  10,000 emails to its servers that met the definition of SPAM under the *CAN SPAM Act of*

4  *2003*. These emails were sent using obviously stolen email identities. These emails were sent

5  with false header information so as to make tracing the source impossible. These emails were

6  sent with subject lines that contained consistently misspelled words. (See Declaration of Nella

7  White, ¶3 – Document #50 previously filed in the within matter). The emails have been

8  produced to Defendants and will be made available to the court if required. Various samples of

9  the emails are attached to Plaintiff's Declaration (Document #50).

10      All of these emails asked the recipient to go to various specific Internet sites, such as

11  wwmort.com, bbmort.com, xxmort.com, etc., and contained a link to get there. However, once

12  a party went to any of those sites, the information and site information was exactly the same.

13  (See Declaration of Nella White, ¶4 and Exhibit C– Document 50). In addition, the request at

14  these sites was always the same – to fill out a profile to receive free quotes.

15          "On the evening of October 25, 2005, and extending into the
16      early hours of October 26, 2005, my mail service, mail.asis.com,
        received many messages regarding real estate financing. I became
17      aware of this because many of these messages were sent to email
        addresses that were no longer active; that is, they had long since
18      been given up by former customers and were therefore available for
        reuse. In order to see whether they were receiving spam, I aliased
19      all of these addresses to one account name." (See Declaration of
        Nella White, ¶5– Document 50).
20
            "Many of the websites referred to in these email messages
21      had an URL of the form xxmort.com or xxmort.net where the 'x'
        consisted of any number or letter causing me to suspect that they
22      were related somehow." (See Declaration of Nella White, ¶6 –
        Document 50).
23
            "On Thursday, October 27, 2005, I filled out a form on one of
24      these websites. I chose wumort.net because it clearly had been
        sent to a large percentage of my customer base, listed
25      alphabetically, leading me to suspect they had been gathered by
        means of a Directory Harvest Attack." (See Declaration of Nella
26      White, ¶7 and Exhibit C – Document 50).

27      The next day various mortgage brokers called and left messages for "Bruce Wolf". (See

28  Declaration of Teresa Singleton, Exhibit A, ¶2 – Document 51). There is no other way for the

Case 3:05-cv-0512₄ JCS   Document 199   Filed 04/11/2₀J7   Page 8 of 25

1  mortgage brokers to have gotten the name or the number they called on October 28, 2005,

2  except from the profile completed by Nella White.

3        "The person 'Bruce Wolf' is fictitious name along with the
4        address created by me strictly for the purpose of this profile. The
       telephone number given in the profile was connected to an
5        answering machine in order to record any responses made to this
       profile only." (Declaration of Nella White, ¶9 – Document 50).

6        Plaintiff has produced emails that were sent to Plaintiff's protected computer from

7  October 25, 2006, through January 31, 2006.

8        Several of the mortgage brokers stated they received the "Bruce Wolf" lead from

9  Azoogleads. In addition, Azoogleads has produced evidence that the lead came from its

10  affiliate. It is obvious that more than one person was involved, as Defendant has through its

11  confused responses to Plaintiff and to co-Defendant Quicken indicated it got the "Bruce Wolf"

12  lead from two totally different sources. (See Exhibit A to REG [Defendant's unverified

13  Response to Plaintiff's Interrogatories Pg. 22, L.22 to Pg. 23, L.7] and Exhibit B to REG

14  [Quicken's Production Document QL-0084 to QL-0085]). Note that in the response to Quicken,

15  Azoogleads calls John Strothers its "affiliate". In its response to Interrogatories, Defendant

16  Azoogleads responds that it received the "Bruce Wolf' lead from Seamless Media Corp.

17        Azoogleads was named in Plaintiff's First Amended Complaint (hereafter "FAC").

18  Plaintiff filed its SAC on October 4, 2006. Defendant Azoogleads did not respond to the FAC.

19  Instead after the SAC was issued Defendant requested and Plaintiff agreed to grant a 45-day

20  extension for answering the complaint, making the due date November 24, 2006. Defendant

21  failed to file a timely answer, filing its answer on November 27, 2006. (Document 134-1).

22  Plaintiff did not object.

23        In an attempt to discover the true relationship between Defendant Azoogleads, the

24  mortgage brokers, and Azoogleads' affiliates Plaintiff propounded on January 23, 2007: a

25  Request for Admissions (hereafter "RFA"); Interrogatories Set One (hereafter "Rogs"); and a

26  Request for Production of Documents Set One (hereafter "RFP"). (Exhibits C, D, and E to

27  REG). The due date for these discovery requests was February 27, 2007. Plaintiff received

28  Defendant's response to the RFA on March 9, 2007, 10 days late. Defendant served its

1   responses to Plaintiff's Rogs and RFP on March 14, 2007, 15 days late. (See Exhibits A-Rogs,
2   F-RFA, and G-RFP to REG).

3         These discovery requests attempt to answer several key questions in this case. Does
4   Azoogleads use affiliates to send email advertisements to consumers? What is the nature of
5   those advertisements? Who are the affiliates that send email advertisements? What is the
6   nature of the agreements with those affiliates? What correspondence occurred between
7   Azoogleads and its affiliates? If Azoogleads has terms and conditions in its agreements with
8   affiliates that prohibit violation of the **CAN SPAM Act**, does Azoogleads enforce those terms?
9   Does Azoogleads have proof of affirmative consent from ASIS email customers to send them
10  email advertisements? What were Azoogleads marketing plans during the incident period?
11  Was Azoogleads running marketing programs that used affiliates to send emails to consumers
12  advertising mortgage loans during the incident period?

13        All of the discovery propounded by Plaintiff relates to key elements of violations of the
14  **CAN SPAM Act**: who sent the emails?; were they sent on someone's behalf?; did the entity
15  hiring the sender manage and control its agents?; did the hiring entity know or consciously
16  avoid knowing the sender was violating the statutes?; did the hiring agent benefit from the
17  relationship?

18        In Defendant's RFA responses Defendant makes multiple improper responses, stating a
19  clear refusal to respond: "Azoogle declines to respond to this Request." Exhibit F to REG –
20  Defendant Azoogleads.com Inc.'s Response to Plaintiff's First Set of Requests for Admission –
21  Responses to Requests No. 12, 13, 14, 27, 28, 29, 30, and 31. Defendant also provides no
22  basis for its objections. Specifically Azoogleads declines to respond to the question of whether
23  Azoogleads "is in the business of acquiring consumer profile information by sending emails or
24  having emails sent by affiliates and/or other agents." (See Exhibit F to REG Pg. 13 L. 14 - 27).

25        In Defendant's late responses to Plaintiff's Rogs and RFPs, Defendant continually
26  attempts to limit the scope of Plaintiff's discovery. In all of Defendant's responses to the
27  Plaintiff's Rogs and RFPs, Defendant attempts to limit the time period for response to only the
28  period of October 25, 2005 until November 14, 2005. Exhibits A and G to REG. Plaintiff clearly

1   defined the time frame for response as August 1, 2005 to present. (Exhibit D to REG Pg. 6, L.

2   10, and Exhibit E to REG Pg. 7 L. 16).

3       In Defendant's responses Defendant continually attempts to limit its responses to only

4   the "Bruce Wolf" lead, even though Plaintiff is asking for information concerning all of

5   Defendant's affiliate relationships, all of Defendant's mortgage broker relationships, all of

6   Defendant's marketing programs, Defendant's opt-in list, etc. (Exhibits A and G to REG).

7       Plaintiff has since agreed to limit its requests to Defendant's email affiliates and

8   mortgage loan vertical.    Plaintiff has also offered the alternative of using an independent third

9   party to search Azoogleads' opt-in and suppression data bases to discover if affirmative

10   consent has been granted. In some cases Plaintiff has offered to limit the time frame to more

11   closely align with the period stated in the SAC. The limitation on time has been linked to the

12   production of marketing plans and "creatives." Plaintiff offered to limit this time frame to June 1,

13   2005, to January 31, 2006. This is the likely period when marketing programs and "creatives"

14   would have been sent to affiliates to use in email advertisements sent in the fall and winter of

15   2005/2006.

16       A complete list of the limits that the parties have agreed to is included in the joint letter to

17   the Court, dated April __, 2007, attached hereto as Exhibit H to REG.

18       Plaintiff asks the court to provide guidance as to scope of discovery in this case for the

19   following questions:

20       1.    Plaintiff is seeking to identify all of Defendant's email affiliates;

21       2.    Plaintiff is seeking to see all of Defendant's email affiliate

22             contracts/agreements;

23       3.    Plaintiff is seeking to see all creatives and marketing plans used by

24             Defendant from the period of June 1, 2005, to January 31, 2006, in

25             Defendant's mortgage loan vertical;

26       4.    Plaintiff is seeking to identify all of Defendant's domain names and IP

27             addresses used in its marketing vertical;

28       5.    Plaintiff is seeking to see all of Defendant's web pages used in

1   Defendant's mortgage vertical from the period of August 1, 2005, to

2   January 31, 2006;

3   6.   Plaintiff is seeking correspondence relating to spam abuse to/from

4   Defendant Azoogleads to/from consumers, Internet Service Providers,

5   spam watch dog agencies (such as SPAMHAUS and SPAM COPS); and

6   all affiliates;

7   7.   Plaintiff is seeking to find out if Defendant Azoogleads has any proof that

8   Plaintiff's ASIS customers have consented to receive email advertisements

9   from Azoogleads;

10   8.   Plaintiff is seeking to determine to what extent the terms "pattern and

11   practice" as used in **15 *USC* 7706**(g)(1) and (2), allow Plaintiff to discover:

12   1) the identity and relationship of Azoogleads to its affiliates; and 2)

13   correspondence between Azoogleads, its affiliates, and other entities

14   regarding spam abuse.

15   **ARGUMENT**

16   **1.   Legal standard for summary adjudication of discovery issues.**

17   Because the parties have decided to call this motion a motion for summary adjudication

18   of issues and the court has agreed, the parties must follow the rules for partial summary

19   judgment as defined in ***FRCP* Rule 56**.

20   Partial adjudication of issues is defined in ***FRCP* Rule 56**(d):

21   (d) Case Not Fully Adjudicated on Motion.  If on motion under this
     rule judgment is not rendered upon the whole case or for all the
22   relief asked and a trial is necessary, the court at the hearing of the
     motion, by examining the pleadings and the evidence before it and
23   by interrogating counsel, shall if practicable ascertain what material
     facts exist without substantial controversy and what material facts
24   are actually and in good faith controverted. It shall thereupon make
     an order specifying the facts that appear without substantial
25   controversy, including the extent to which the amount of damages
     or other relief is not in controversy, and directing such further
26   proceedings in the action as are just. Upon the trial of the action the
     facts so specified shall be deemed established, and the trial shall be
27   conducted accordingly.

28

1    While the issues decided in an *FRCP* Rule **56**(d) motion are final they do not represent

2   a final judgment, and therefore cannot be appealed prior to final judgment. *Biggins v. Oltmer*

3   *Iron Works*, 154 F.2d 214 at 217 (7th Cir. 1946); also see *Leonard v. Socony-Vacuum Oil*

4   *Co.*, 130 F.2d 535 at 536 (7th Cir., 1942).

5    A motion for summary adjudication resolves whether certain facts are established.  The

6   only facts at issue in this motion is whether there are facts to support plaintiff's claim that

7   Plaintiff's discovery requests may reasonably lead to admissible evidence.

8    The standard for deciding what is discoverable is defined in *FRCP* Rule 26(b)(1):

9        (1) In General. Parties may obtain discovery regarding any matter,
         not privileged, that is relevant to the claim or defense of any party,
10       including the existence, description, nature, custody, condition, and
         location of any books, documents, or other tangible things and the
11       identity and location of persons having knowledge of any
         discoverable matter.   For good cause, the court may order
12       discovery of any matter relevant to the subject matter involved in the
         action.  Relevant information need not be admissible at the trial if
13       the discovery appears reasonably calculated to lead to the
         discovery of admissible evidence.
14

15    Therefore any matter not privileged and relevant can be discovered.  The evidence

16   sought need only appear to reasonably lead to admissible evidence.  It does not need to be

17   admissible at trial.

18    Relevance is defined in **FRE 401** as: "evidence having any tendency to make the

19   existence of any fact that is of consequence to the determination of the action more probable or

20   less probable than it would be without the evidence."

21    Therefore the determination of whether Plaintiff may discover the evidence described, by

22   issues one and two above, depends on whether the discovery of that information shows some

23   fact of consequence more or less probable.  Therefore, Plaintiff will address those issues in

24   context of the elements of the statutes at issue.  That is, Plaintiff will present a prima facie case

25   and incorporate the issues within that argument.

26   2.   Plaintiff's request for information about affiliates is consistent with the
         language of the *CAN SPAM Act.*
27
         a.   Plaintiff's Prima Facie case.
28
     Plaintiff's requests for information are consistent with Plaintiff's *CAN SPAM Act* causes

1   of action and are relevant to showing the principle elements of the causes of action.

2   An Internet Access Provider (IAP) may bring an action under 15 *USC* 7704(a)(1), or (b)

3   or (d) if he is adversely affected.  In addition, an IAP may also bring an action under 15 *USC*

4   7704(a)(2), (3), (4), or (5) if he can show a pattern or practice that violates those paragraphs.

5   Plaintiff has brought actions complaining of violations of 15 *USC* 7704(a)(1), (2), (3), and

6   (5).  Plaintiff has also brought its action under 15 *USC* 7704(b)(1) and (2).

7   To survive a motion for summary judgment based on an action brought under 15 *USC*

8   7704(a)(1) a plaintiff must answer the following questions:

9   (A)   Is Plaintiff a Provider of Internet Access Service and did he suffer an

10         adverse effect?

11   (B)   Did Defendant "Initiate" Spam E-Mail to Plaintiff?

12         (1)   Were the e-mails sent "on behalf" of Defendant?

13         (2)   Did   Defendant   have   "actual   knowledge"   or

14               "consciously avoid knowing" of violations of the CAN-

15               SPAM Act?  *Hypertouch, Inc. v. Kennedy-Western*

16               *University*, Not Reported in F.Supp.2d, 2006 WL

17               648688 (N.D.Cal.,2006) – courtesy copy attached as

18               Exhibit I to REG.

19   (C)   Did the emails contain "header information that is materially false or

20         materially misleading" ?  15 *USC* 7704(a)(1)

21   The language of 15 *USC* 7704(a)(2) adds an additional violation based on a commercial

22   electronic message that contains a false or misleading subject line.

23   The term "initiate the transmission" is defined in 15 *USC* 7702(9) as: "means to originate

24   or transmit such message or to procure the origination or transmission of such message... For

25   purposes of this paragraph, more than one person may be considered to have initiated a

26   message."

27   The term "procure" is defined in 15 *USC* 7702(12) as: "means intentionally to pay or

28   provide other consideration to, or induce, another person to initiate such a message on one's

1    behalf." 15 *USC* 7706(g)(2) modifies the standard definition of procure, as it applies to IAPs, by
2    adding the following language after "behalf":   "with actual knowledge, or by consciously
3    avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that
4    violates this chapter."

5          Note, there is no requirement in the language of 15 *USC* 7704(a)(1) that: distinguishes
6    the type of email ("a commercial electronic mail message, or a transactional or relationship
7    message" encompasses all possible forms of email for purposes of the *CAN SPAM Act* - see
8    15 *USC* 7702(2)); even if the email was solicited.  Merely sending or procuring the sending on
9    one's behalf of an email containing false or misleading header information to a protected
10   computer is a violation actionable by an IAP.

11         15 *USC* 7704(b)(1) and (2) relate to aggravated violations for directory harvests of email
12   accounts and use of automated methods for creation of email accounts in order to send emails
13   in violation of 15 *USC* 7704(a).  Therefore, after establishing a case for violation of 15 *USC*
14   7704(a), an IAP may also pursue treble statutory damages under 15 *USC* 7704(b)(1) or (2).
15   (See 15 *USC* 7706(g)(3)(C)(ii).)

16         Plaintiff has provided evidence that it is an IAP and a statement of adverse affect.  Since
17   these elements are not at issue here and these are large documents, Plaintiff will not present
18   this evidence here.  However, Defendant has received the evidence and it can be produced to
19   the court upon request.

20         Evidence that the emails contain false header information and misleading or false
21   subject lines is also not at issue here.  The actual emails have been provided to the Defendant
22   as well as an explanation of how a representative sample of the emails violate the false header
23   and misleading subject line prohibitions.  Because this information is very high volume, Plaintiff
24   will not present that evidence here, but it can be produced to the court upon request.

25         Therefore, Plaintiff's burden here is to show that Defendant initiated the emails to
26   Plaintiff.  That is, Defendant either sent or procured the sending of the emails with actual
27   knowledge or consciously avoiding knowing that the emails were sent in violation of the statute.
28   ///

1           b.      **Defendant is connected to the emails by the "Bruce Wolf" lead.**

2           Defendant has admitted they provided the "Bruce Wolf" lead to Quicken Loans.  (See

3      Exhibit F to REG, Response No. 22).

4           Defendant has provided evidence that its affiliate, either Seamless Media Corp or John

5      Strothers, provided the "Bruce Wolf" lead to Defendant.  (See Exhibit A to REG Defendant's

6      unverified Response to Plaintiff's Interrogatories Pg. 22 L. 22 to Pg. 23 L. 7 and Exhibit B to

7      REG Quicken's Production Document QL-0084 to QL-0085).

8           As discussed above, the information contained in the "Bruce Wolf" lead was created by

9      Nella White of ASIS.  (See Declaration of Nella White, ¶7 and Exhibit C – Document 50).

10     There is no way for anyone to have obtained the "Bruce Wolf" lead information except through

11     the form that Nella White filled out.  Therefore, it is more likely than not that either Seamless

12     Media Corp or John Strothers owned the website and sent the emails to consumers at email

13     accounts at asis.com.

14          Defendant's have produced a contract for Seamless Media Corp, (Exhibit J to REG) it

15     has not produced a contract for John Strothers.  This contract does not prohibit the sending of

16     emails in violation of the **CAN SPAM Act**, it only refers to violations in reference to the use of

17     Defendant's suppression list.  Exhibit J to REG Pg. AZ000007 para. 12.  Therefore, if the email

18     was sent by Seamless Media Corp, Defendant has produced no evidence that it prohibited

19     violations of the **CAN SPAM Act** in its contract.

20          The definition of "procure" includes: "induce, another person to initiate such a message

21     on one's behalf." 15 **USC** 7702(12).  The contract In place with Seamless Media Corp is at a

22     minimum an indication that inducement occurred.  Plaintiff has subpoenaed information from

23     Seamless Media Corp to discover their actual involvement and whether or not they used email

24     solicitations.

25          As discussed above Defendant has not admitted or denied as to whether it had a

26     contract with the Defendant's associated with OPTION GLOBAL.  Exhibit F to REG Responses

27     Nos. 40–43.

28          There is a clear connection between Azoogleads and the information entered by Nella

Case 3:05-cv-05124-JCS    Document 199    Filed 04/11/20..    Page 16 of 25

1    White in response to an spam email, that Azoogleads then sold to Defendant Quicken Loans.

2        The basis for Defendant's argument not to respond to Plaintiff's discovery is that they did

3    not send the emails, nor procure the sending of the emails.  The evidence of the "Bruce Wolf"

4    lead, Azoogleads admission that they received the email from its affiliate, and the existence of

5    a contract to deliver leads stands in stark opposition to the statement that Azoogleads did not

6    procure the sending of at least one email – the email from which the "Bruce Wolf" lead was

7    generated.

8        c.    All of the emails can be linked to Defendant.

9        The other outstanding question is whether the other emails received by Plaintiff can be

10   tied back in some manner to Azoogleads?

11       As Nella White stated, the emails all have similar characteristics.  (See ¶3, 4, and 6 of

12   the Declaration of Nella White – Document 50).  Plaintiff has conducted a partial study of the

13   domain names and IP addresses of the web sites where the recipient was directed.  (See ¶2

14   and Exhibit A to Declaration of Michelle Burdock).  This study indicates that a large number of

15   the websites that the emails directed the recipient to were at the same IP address, even though

16   the domain name was different.

17       For example domain names wumort.com and wumort.net directed the recipient to

18   exactly the same IP addresses.  The IP address changed over time.  Changing the IP Address

19   regularly is a tactic of spammers to prevent being traced.    Wumort.com and wumort.net

20   changed to exactly the same IP addresses on exactly the same day.  See Exhibit A to

21   Declaration of Michelle Burdock.

22       Several other domain names were discovered to link to the same IP address as

23   wumort.com and wumort.net.  See ¶2 of Declaration of Michelle Burdock for a list of domain

24   names.  Over 1658 emails of the subject emails directed the recipient to these domain names,

25   linking the source of the emails.  See ¶4 of Declaration of Michelle Burdock.  The Website

26   wumort.net was used by Nella White to enter the "Bruce Wolf" information.  (See  Declaration

27   of Nella White ¶7 and Exhibit C– Document 50).  This indicates that, at a minimum, 1658 of the

28   emails were from exactly the same source.  The source that is tied to Azoogleads by the "Bruce

1  Wolf" lead.   Plaintiff is preparing a complete study of the emails with tables comparing the
2  various characteristics of the emails and will make this information available when ready.

3      Other more obvious indications link the emails as coming from the same source.   For
4  example: 2001 of the emails contain the subject line "Excellent mortagee ratees", misspelling
5  the words in exactly the same manner; 2396 of the emails contain the subject line "Low
6  mortagge ratee approval"; 2135 of the emails contain the subject line "Mortagge ratee
7  approved"; and 2238 of the emails contain the subject line "Notice: Loww mortagee ratee
8  approved". See ¶5 of Declaration of Michelle Burdock.

9      Other characteristics in the emails are also exactly the same, for example 1397 emails
10  contain the statement "You could get over $460,000 for as little as $350 a month!".   5826
11  emails contain the statement "Keine email hier", surrounded by gibberish.   See ¶6 of
12  Declaration of Michelle Burdock.  The use of "Keine email hier" is an obvious attempt to include
13  an unsubscribe link while avoiding the spam filters, which look for unsubscribe links as part of
14  their filtering process.

15      These circumstantial facts clearly indicate that these emails either came from the same
16  source or that the same marketing materials were used in their creation.  In either case, since
17  the "Bruce Wolf" email is likely to have come from one of Azoogleads affiliates, on behalf of
18  Azoogleads, it is reasonable to assert on the circumstances demonstrated in the actual emails
19  that most or all of them came in the same manner.

20      Plaintiff now wishes to clarify the connection between this data, Defendant Azoogleads,
21  and Defendant's affiliates.

22      d.    Defendant's contention that they did not send or procure the sending
23           of the emails is not sound.

24  Plaintiff has requested information about Defendant's affiliates: who they are, what is the
25  relationship;  proof  of  agreements/contracts;  correspondence  of  marketing  materials;
26  correspondence regarding spam abuse; and payments.  This information is consistent with the
27  language of the *CAN SPAM Act* of 2003, *California Business and Professions Code* §
28  17529.5 and the intent of the legislature in enacting these statutes.

Defendant complains that this information is not relevant since Azoogleads did not send the emails and its affiliates (parties in privity) did not send the emails. But in at least one case, the "Bruce Wolf" lead, a direct connection has been shown. In addition, as demonstrated above at least 1658 of the emails containing wumort.net or wumort.com came from the exact same source as the "Bruce Wolf" email. Therefore, there is more than sufficient evidence to change the terms of the inquiry to:

1. Whether the following types of evidence are discoverable on the question of whether a defendant who induced the sending of 1658 emails in violation of the **CAN SPAM Act** and **California Business and Professions Code** §17529.5 can be forced to produce evidence regarding whether it procured the sending of those emails within the meaning **15 USC** 7702(12) and **15 USC** 7706(g).

   e. **The term "procure" was intended to include affiliates and proof of control of affiliates is part of the process envisioned by the legislature.**

The legislature envisioned the use of third parties by advertising companies to shield themselves from liability for spamming. The **CAN SPAM Act** makes an advertiser liable for procuring the sending of spam with knowledge, or consciously avoiding knowing that the statute was being violated. **15 USC** 7706(g)(2).

The legislature also foresaw that advertisers would create agreements that would, on paper, shield them from liability.

"Subsection (g)(2) contains a special definition of "procure" for purposes of ISP enforcement actions that includes a scienter requirement with regard to whether a person who initiates commercial email on their behalf is engaging or will engage in a pattern or practice that violates this Act. It is the intent, with regard to the falsification violations of Section 5(a)(1), that "conscious avoidance of actual knowledge" be construed broadly in a manner consistent with a fundamental purpose of this Act to prohibit and deter falsification techniques in commercial e-mail. Therefore if the procurer has an indication that the initiator is *E73 or has engaged in any falsified spamming technique prohibited by Section 5(a)(1) or 18 U.S.C. 1037, the Act is intended to be read so that such a procurer meets the standard of "conscious avoidance of actual knowledge" of violations of the Act by an initiator unless the

procurer and takes reasonable steps to prevent such violations by the initiator.

Actual knowledge or conscious avoidance of actual knowledge could be evidenced, for example, by information obtained by the procurer directly from an initiator, or via a complaint, warning or cease and desist communication received from a recipient, Internet access service, or law enforcement alerting the procurer that an initiator to whom the procurer is providing consideration is violating the law. Conscious avoidance of actual knowledge could also be evidenced, for example, by: (1) Doing little or nothing to determine whether suspect initiators who are marketing partners, resellers, affiliates, agents or contractors of the procurer are violating or have violated Federal or State law; (2) failing to follow the procurer's stated policies or procedures prohibiting illegal e-mail advertising methods by initiators who are marketing partners, resellers, affiliates, agents or contractors; (3) repeatedly allowing initiators who are engaged in illegal e-mail advertising methods to provide false information or to fail to identify themselves when they sign up to conduct e-mail advertising for the procurer's products or services; (4) repeatedly paying initiators whom the procurer has terminated for violating the procurer's e-mail policies prohibiting illegal spamming methods; or (5) allowing initiators who have been terminated for violating the procurer's policies prohibiting illegal e-mail activities repeatedly to sign up for new accounts. The above is not an exhaustive list of ways in which the requisite state of mind can be evidenced.

**150 Cong. Rec. E72-02**, 2004 WL 170208 (Cong.Rec.), SPEECH OF HON. JOHN D. DINGELL OF MICHIGAN, Wednesday, January 28, 2004 (Courtesy copy provided as Exhibit J to REG).

f.   Evidence of pattern and practice is applicable to the *CAN SPAM Act* and is admissible under *FRE* 404(b).

The information requested under this assumption all concerns whether there is a pattern and practice of violation of the statute – Items 1(A) – 1(D). Evidence of pattern and practice is allowed under both 15 *USC* 7706(g)(1) and (g)(2). 15 *USC* 7706(g)(1) states: "a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 7704(a) of this title…". 15 *USC* 7706(g)(2) states: "with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this chapter."

Evidence of a pattern or practice can therefore be used to show a violation of 15 *USC* 7704(a)(2), (3), (4), and (5). Evidence of pattern or practice can also be used to show that an affiliate that was induced to send emails had a pattern or practice of sending spam emails.

Case 3:05-cv-05124-JCS   Document 199   Filed 04/11/20   Page 20 of 25

1    Evidence of prior acts may clearly be used to establish the existence of a pattern or
2    scheme. *FRE* 404(b); *Dosier v. Miami Valley Broadcasting Corp.*, 656 F.2d 1295 at 1300
3    (9th Cir., 1981). The court in *Dosier* found that a material issue of fact existed because
4    evidence of prior bad acts had not been shown to be unrelated.

5    Plaintiff is requesting information concerning whether Defendant or its affiliates have
6    sent spam emails in the past and whether there have been complaints made by various parties
7    concerning past spam abuse cases. This information is clearly indicative of pattern and
8    practice of violation either by Defendant or its affiliate.

9    To gather this information Plaintiff must know who Defendant's affiliates were during the
10   incident period and what was Defendants relationship to those affiliates. Plaintiff must know
11   what resources Defendant had available. Plaintiff must know Defendant's URL's, Domain
12   names, IP Addresses, and websites. These can be used to track abuse complaints. Plaintiff
13   must know who was providing Internet services to Defendant, this includes its ISPs. Plaintiff
14   must be able to discover internal and external correspondence and files regarding spam
15   abuse. In essence the evidence that will show or not show a pattern or practice of abuse
16   either by Defendant or its affiliates.

17   Plaintiff must also be able to discover whether or not Defendant knew its affiliates were
18   regularly violating the *CAN SPAM Act*. This supports the contention of knowing or
19   consciously avoiding knowing its affiliates were spamming. To support this issue, Plaintiff
20   must know who Defendant's affiliates were and what contracts were in place at the time of the
21   incident.    Plaintiff must know what correspondence concerning abuse went between
22   Defendant, its affiliates, and Defendant's ISP (spam abuse complaints generally are sent to
23   ISPs).

24   Therefore, Plaintiff must be allowed to discover the information described in Issue 1(A)
25   – 1(D) to determine if there is a pattern and practice that fits a violation of the *CAN SPAM Act*.

26   3.   **The definition of advertise as used in California Business and Professions
          Code and California law support discovery of information based on the
27        emails at issue in this case.**

28   Plaintiff contends that the emails and other established facts in this case provide a basis

1  for establishing Defendant as the advertiser in the emails at issue.  This contention justifies

2  discovery of the marketing materials and relationships used by Defendant and its affiliates to

3  further demonstrate the advertising relationship.

4      ***California Business and Professions Code*** §17529.5 provides:

5          (a) It is unlawful for any person or entity to advertise in a

        commercial e-mail advertisement either sent from California or sent

6          to a California electronic mail address under any of the following

        circumstances:

7

8      Those circumstances include: use of a third parties email account or domain name

9  without the third parties permission; false header information; or a misleading subject line.

10      The emails at issue have been demonstrated to violate all of these requirements and

11  this has been produced to Defendant.  Since proof of these issues is not in dispute here,

12  Plaintiff will not produce a copy of this evidence here.  If required the evidence can be

13  produced for the court at its request.

14      The emails were sent to email accounts in Garberville, California.

15      The issue here is whether the emails in this case represent an advertisement sent by

16  Defendant Azoogleads.

17      ***California Business and Professions Code*** §17529.1 defines the term advertiser as:

18  "(a) 'Advertiser' means a person or entity that advertises through the use of commercial e-mail

19  advertisements."

20      The California Legislature decided:

21          "There is a need to regulate the advertisers who use spam, as well

        as the actual spammers, because the actual spammers can be

22          difficult to track down due to some return addresses that show up

        on the display as "unknown" and many others being obvious fakes

23          and they are often located offshore."  ***California Business and***

24          ***Professions Code*** §17529(j)

25      The emails at issue in this case obviously fit this description.  There is no way to

26  identify the identity of the sender through the information provided in the email.  In addition,

27  false names, such as "USA Lenders Network" were used to hide the identity of the advertiser.

28      The California Legislature also found that:  "The true beneficiaries of spam are the

advertisers who benefit from the marketing derived from the advertisements." *California*

*Business and Professions Code* §17529(k).

*California Business and Professions Code* §17529.1(c) makes the following

definition:

> "'Commercial e-mail advertisement' means any electronic mail
> message initiated for the purpose of advertising or promoting the
> lease, sale, rental, gift offer, or other disposition of any property,
> goods, services, or extension of credit." (Underline added for
> emphasis.).

California has adopted a broad definition of the term advertise: "any means of

exploitation through the conveyance of information is advertising." *People v. McKean*, (1925)

76 Cal.App. 114 at 131 [243 P. 898].

Therefore, based on the definition of advertising used in California there is no

requirement that the advertisement contain the actual name of the advertiser. The

requirements are: 1) there be a conveyance of information; 2) there is an exploitation of the

intended recipient of the advertisement; 3) the advertiser benefit from the advertisement.

There is no issue as to whether the emails at issue are advertisements. Clearly by

looking at the emails one can determine that an offer is being made that is intended to solicit

business from potential customers. (See Declaration of Nella White, ¶4 and Exhibit C –

Document 50). The first email in the group states:

> "We tried contacting you awhile ago about your low interest
> morta(ge rate.
>
> You have been selected for our lowest rate in years...
>
> You could get over $460,000 for as little as $350 a month!
>
> Ba(d credit, Bank*ruptcy? Doesn't matter, low rates are fixed no
> matter what!
>
> To get a free, no obli,gation consultation click below:
>
> http://www.wumort.net"

An offer is being made to get a low interest mortgage rate offer simply by clicking on the

link to wumort.net. This is an advertisement. There is a clear conveyance of information that

is intended to exploit the intended recipient.

Does Defendant Azoogleads benefit from this advertisement? As discussed above

1   Defendant Azoogleads sold the "Bruce Wolf" lead under contract to Quicken Loans. (See

2   Exhibit F to REG, Response No. 22). Quicken Loans has provided significant evidence of this

3   relationship by production of their contract with Defendant Azoogleads and the lead sheet sent

4   by Defendant Azoogleads. Exhibits L and M to REG. Therefore, Azoogleads is a direct

5   beneficiary of this advertisement.

6       In addition the advertisement clearly concerns one of the specific areas defined by the

7   ***California Business and Professions Code*** §17529.1(c): "extension of credit".

8       Azoogleads is advertising through commercial email advertisements by use of offers to

9   extend credit in order to get sales leads to sell to mortgage brokers.

10       There is no requirement in any of the California statutory language or California case

11   law to support a requirement that the advertiser be identified in the advertisement.

12       Azoogleads identifies its relationship with its affiliate Seamless Media Corp as placing

13   an "Insertion Order for Mortgage Lead" in an advertisement. Exhibit J to REG. In Azoogleads

14   marketing/media agreement with Quicken Loans they state:

15 
16 
17          "Whereas, Company (referring to Azoogleads) is engaged in the business of providing opt-in media and advertising services to consumers who have expressed an interest in receiving, for their benefit, information about specific products and services:".

         Exhibit L to REG Pg. QL0031, second paragraph.

18 
19       Azoogleads has admitted by this contract that it is in the business of advertising and is

20   acquiring leads through its marketing services to sell to Quicken Loans. The "Bruce Wolf" lead

   was sold by Defendant Azoogleads to Defendant Quicken Loans. Exhibit M to REG.

21 
22       Azoogleads has provided no evidence that it is not an advertiser based on the definition

23   of California statutes and California case law. There is a clear link between the email

24   advertisement used to generate the "Bruce Wolf" lead and Azoogleads. Azoogleads has

   benefited from that advertising activity by selling the lead to Quicken Loans.

25 
26       Therefore, Azoogleads is advertising in the emails at issue and discovery of its activities

   is appropriate and will lead to admissible evidence.

27 
28       Plaintiff has requested the marketing materials/programs, contracts with affiliates, and

   the identities of marketing managers used by Azoogleads during the incident period in its

1  mortgage vertical. In a second set of discovery, Plaintiff has asked for all of the "creatives"
2  (advertising insertion materials) used by Azoogleads and provided to email affiliates during and
3  three months prior to the incident period in Azoogleads mortgage vertical.

4      Plaintiff is trying to discover if the marketing materials are related to the emails at issue.
5  This information would be directly admissible to show that Azoogleads was providing
6  marketing materials to its affiliates similar to those appearing in the emails at issue. This
7  information would also be directly admissible to support the contention that Azoogleads
8  induced its affiliates to send the emails at issue.

9  **4.   Defendant has waived all objections by their untimely responses to
       Plaintiff's Rogs and RFPs.**

10
11     Defendant has waived all objections to Plaintiff's first set of Rogs and RFPs by its
       untimely responses and should be compelled to respond fully to the requests. While this is a
12
       side issue to the issues stipulated for summary adjudication it is a primary issue as to whether
13
       Plaintiff's discovery can be objected to as overbroad, vague, ambiguous, etc. This issue is
14
       also critical as to whether Defendant may resist discovery through claims of privilege – it is
15
       clear from the applicable case law that they cannot.
16
17     *FRCP* Rule 33(b)(4) states: "(4) All grounds for an objection to an interrogatory shall be
       stated with specificity. Any ground not stated in a timely objection is waived unless the party's
18
       failure to object is excused by the court for good cause shown." "Statutory interpretation
19
       begins with the plain meaning of the statute's language. Where the statutory language is clear
20
       and consistent with the statutory scheme at issue, the plain language of the statute is
21
       conclusive and the judicial inquiry is at an end." *Molski v. M.J. Cable, Inc.*, --- F.3d ----, 2007
22
       WL 865532 at 7 (9th Cir.,2007); citing *Botosan v. Paul McNally Realty*, 216 F.3d 827 at 831
23
       (9th Cir., 2000).
24
25     "Generally, in the absence of an extension of time or good cause, the failure to object to
       interrogatories within the time fixed by Rule 33, FRCivP, constitutes a waiver of any objection.
26
       This is true even of an objection that the information sought is privileged." *Davis v. Fendler*,
27
       650 F.2d 1154 at 1160 (9th Cir., 1981). The court in *Richmark Corp. v. Timber Falling*
28
       *Consultants*, 959 F.2d 1468 at 1473 (9th Cir.,1992) citing *Davis v. Fendler* further applied

PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION    21                    C-05-5124 JCS

this rule to **FRCP Rule** 34 as it applies to requests for production.

Defendant was 15 days late in responding to Plaintiff's discovery requests. The only excuse that Defendant has offered is that the information is not relevant to the case at issue and/or that Plaintiff has not provided Defendant proof as to Defendant's liability in this action. Defendant made these arguments in its untimely responses. These arguments hardly represent good cause for not responding in a timely manner. Defendant could easily have made these objections in a timely manner and then argued their merits. Whether or not objections are waived is not a matter of the merits of the objections but of the timeliness of the showing. **Safeco Ins. Co. of America v. Rawstrom**, 183 F.R.D. 668 at FN1 (C.D.Cal.,1998); citing **Peat, Marwick, Mitchell & Co. v. West**, 748 F.2d 540 at 542 (10th Cir.,1984).

Therefore, without a showing of good cause to the court, Defendant's have waived all objections as to Plaintiff fist set of Rogs and RFPs.

Therefore, Defendant should be ordered to respond to each of Plaintiff's Rogs and RFPs.

### CONCLUSION

Therefore, the information requested in Plaintiff's discovery requests is intended to lead to admissible evidence and is relevant to this action. Therefore, it is within the court's discretion to allow discovery of evidence regarding Azoogleads and its affiliates reputations of spam abuse and its email advertising materials. Defendant has waived all objections to Plaintiff's first set of Rogs and RFPs. In the interests of justice, the court should compel responses to Plaintiff's discovery requests.

**SINGLETON LAW GROUP**

Dated:        April 11, 2007                  _____/s/ Jason K. Singleton_____
                                              Jason K. Singleton,
                                              Richard E. Grabowski, Attorneys for Plaintiff,
                                              **ASIS INTERNET SERVICES**