1

2

3

4

5 UNITED STATES DISTRICT COURT

6 NORTHERN DISTRICT OF CALIFORNIA

7

8 ASIS INTERNET SERVICES,                    Case No. C-05-05124 JCS

9         Plaintiff,                         **ORDER GRANTING DEFENDANT'S**
                                             **MOTION FOR SUMMARY JUDGMENT,**
10        v.                                 **DENYING PLAINTIFF'S MOTION FOR**
                                             **SUMMARY JUDGMENT AND DISMISSING**
11 OPTIN GLOBAL, INC., ET AL.,               **ACTION [Docket Nos. 318, 320]**

12        Defendants.                        ~~(FILED UNDER SEAL)~~
   _____/        REDACTED - PUBLIC VERSION
13

14 **I.    INTRODUCTION**

15        Plaintiff, ASIS Internet Services ("ASIS"), filed this action on December 12, 2005, asserting

16 that various Defendants, including AzoogleAds.com ("Azoogle"), violated the CAN-SPAM Act of

17 2003, 15 U.S.C. §§ 7701 *et seq.*, and California Business and Professions Code § 17529.5.

18 Azoogle and ASIS now bring motions for summary judgment (hereinafter "Plaintiff's Motion" and

19 "Defendant's Motion"). The parties have consented to the jurisdiction of a United States Magistrate

20 Judge pursuant to 28 U.S.C. § 636(c). A hearing on the Motions was held on Friday, March 21,

21 2008, at 1:30 p.m. For the reasons stated below, Plaintiff's Motion is DENIED. Defendant's

22 Motion is GRANTED.[1]

23

24

25

26

27        [1] The Court declines to rule on Azoogle's objections to Plaintiff's evidence [Docket No. 374]
   because the objections have no bearing on the Court's holding; even assuming that all of Plaintiff's
28 evidence is admissible, the result is the same as to the issues on which the Court's ruling depends.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## II.   BACKGROUND

### A.   Facts[2]

#### 1.   The Parties

Plaintiff ASIS is a California corporation and an Internet Access Service Provider.  Second Amended Complaint ("SAC") at 2; *see also* Joint Statement of Stipulated Facts in Support of Motion for Summary Judgment ("Joint Statement"), No. 1 (stipulation that ASIS is a provider of Internet Access Service with the meaning of 15 U.S.C. § 7706(g)(1), 15 U.S.C. § 7702(11) and 47 U.S.C. § 231(e)(4)), No. 2 (stipulation that ASIS is an Electronic Mail Service Provider within the definition of California Business and Professions Code §§ 17529.5 and 17529.1(h)).  According to ASIS President and CEO Nella White, ASIS was created in 1995 and in 2005 had just under 1,000 Internet access and e-mail customers.  Declaration of Nella White in Support of Plaintiff's Motion for Summary Adjudication of Issues ("White Motion Decl."), ¶¶ 2-3.

Azoogle is an Internet marketing company through which "lead vendors" and providers channel leads to sellers of goods and services.  Declaration of David Graff in Support of AzoogleAds.com, Inc.'s Motion for Summary Judgment or in the Alternative Summary Adjudication ("Graff Motion Decl."), ¶ 2.

#### 2.   How Azoogle Obtained and Transmitted Leads

Azoogle's CEO, Donald Mathis, explains how Azoogle obtained and transmitted leads in 2005, during the relevant period for this case, as follows:

> Since 2003, Azoogle has acquired marketing leads by way of two categories of third party lead providers: affiliates and third party vendors.  Azoogle has always relied primarily on registered affiliates to generate leads, which Azoogle then sells to the ultimate purchaser.  Azoogle no longer uses third-party vendors as lead providers.

> Prior to generating any leads for Azoogle, prospective affiliates must register with, and be accepted after a vetting process by, Azoogle to become an affiliate.  A prospective affiliate must agree to Azoogle's Affiliate Terms and Conditions, which among other things, expressly prohibits the affiliate from violating CAN-SPAM or any other law.

---

[2] Although each party submitted literally hundreds of facts that are alleged to be undisputed, the parties were able to agree on only *nine* facts in their Joint Statement of Undisputed Facts.  The Court, therefore, has been left to determine, based on the evidence and arguments by the parties, which facts are undisputed and which are not.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

An Azoogle affiliate generates leads for Azoogle by first logging into the AzoogleAds 2.0 (previously AzoogleAds 1.0) software system and selecting from a list of Azoogle's branded offers to serve as the basis for its lead generation. During October 2005, Azoogle had a few such properties in its mortgage lead business, which included its branded offers: Low Rate Advisors and Christian Mortgages USA. Azoogle maintained creative material for each of these branded offers, which an affiliate could download, if contractually permitted, from Azoogle's protected computers, through the AzoogleAds software system. Once an affiliate downloaded Azoogle's creative material, that affiliate could use the creative material as specified in the terms of its contract with Azoogle. The contract might permit the affiliate to use the creative material in emails, website banners, or other specified media, though only in connection with the related Azoogle branded offer. When an affiliate placed the downloaded creative material in an email or banner ad, users would click on a link in the email or banner add and be redirected to the Azoogle website for that respective branded offer, such as LowRateAdvisors.com.

████████████████████████████████████

Even with its broad affiliate network, Azoogle has at times been unable to satisfy the demands of its lead purchasers by affiliate lead generation alone. In such situations, Azoogle has used third party vendors to provide qualified mortgage leads to Azoogle, in order to satisfy the remainder of the demand. Because vendors represented that they had their own internal compliance procedures, Azoogle did not vet them in the same manner that it vetted its own affiliates.

. . .

Unlike affiliates, a third-party vendor would enter into a contract with Azoogle, known as an Insertion Order, whereby the vendor agreed to sell Azoogle certain qualified mortgage leads subject to express contractual criteria. These leads were *not* generated by sending consumers to web pages owned and operated by Azoogle. Rather, the leads were generated solely through the methods and creative materials owned by the vendor, though the Insertion Order expressly limited the acceptable methods the vendors could use to generate the leads.



3



1  Declaration of Donald H. Mathis in Opposition to Plaintiff ASIS Internet Services, Inc.'s Motion for

2  Summary Adjudication of Issues ("Mathis Opposition Decl."), ¶¶ 7-14. According to Azoogle, it

3  has never sent unsolicited emails to generate leads for its clients. *Id.*

4      Regarding the use of Azoogle's creative materials by vendors, Azoogle's Director of Media

5  Buying, Julian Mossanen, testified in his deposition that

6

7      Supplemental Declaration of Henry M. Burgoyne, III in Support of AzzogleAds.com,

8  Inc.'s Reply Memorandum for Summary Judgment or in the Alternative Summary Adjudication

9  ("Burgoyne Supp. Decl."), Ex. C (Mossanen Depo) at 97-98.

10

11      *Id.* at 98.

12      Mossanen also testified in his deposition regarding the process of finding third party vendors.

13

14      Singleton Opposition Decl., Ex. J (Mossanen

15  Depo.) at 22.

16

17

18  *Id.* at 23-24.

19

20      *Id.* at 33.

21      *Id.* at 24.

22

23      *Id.* at 24.

24      *Id.* at 36.

25      *Id.*

26      *Id.*

27      *Id.* at 37.

28      *Id.* at 51.

United States District Court
For the Northern District of California

4

1

2                                                           *Id.* at 129.

3

4                                                  Singleton Opposition Decl., Ex. M

5   (Zhardanovsky Depo.) at 21. However, Marvin Hernandez, who handled spam complaints at

6   Azoogle, testified in his deposition that there were a handful of Azoogle affiliatees who had received

7   more than ten spam complaints. Singleton Opposition Decl., Ex. K (Hernandez Depo.) at 67-68.

8                                   **3.      Azoogle and Spam Compliance**

9        Azoogle was founded in 2001 as an email Application Service Provider ("ASP"), which

10  worked with bulk email providers on behalf of sellers of goods and services. Mathis Opposition

11  Decl., ¶ 6. According to CEO Mathis, Azoogle gave up its ASP line of business in 2003 when it

12  began receiving complaints about its email partners. *Id.* However, in September 2004, Azoogle was

13  suspended by ISP Savvis because an email marketing watchdog, SpamCop, had complained about

14  Azoogle's work with bulk emailers. *Id.*; *see also* Declaration of Margarita Calpotura in Opposition

15  to Plaintiff ASIS Internet Services, Inc.'s Motion for Summary Adjudication of Issues ("Calpotura

16  Opposition Decl."), Ex. B at 853 (letter from Savvis to Azoogle dated September 10, 2004, notifying

17  Azoogle that Savvis was suspending its services due to excessive spam complaints).

18       In February 2005, Azoogle learned that it was listed on the ROKSO website maintained by

19  Spamhaus Project. Mathis Opposition Decl., ¶ 6. Spamhaus describes itself as "an international

20  non-profit organization whose mission is to track the Internet Spam Gangs . . . ." Calpotura

21  Opposition Decl., Ex. G (Spamhaus Project web page). Spamhaus publishes the Register of Known

22  Spam Operations, known by its acronym, "ROKSO." *Id.* Starting in February 2005, Azoogle

23  worked with Spamhaus to improve its compliance with Spamhaus's anti-spam guidelines and in

24  early 2006, Azoogle was removed from ROKSO. Mathis Opposition Decl., ¶ 6; Calpotura

25  Opposition Decl., Ex. B (email correspondence between Azoogle and Spamhaus).

26                                   **4.      "Knock-Off" Websites**

27       In an email dated February 9, 2005, Azoogle asked Spamhaus for advice about spammers

28  who were copying Azoogle images:

United States District Court
For the Northern District of California

5



Calpotura Opposition Decl., Ex. B at AZ 49-50.

One such knock-off website was LowRateAdvisors.net. Mathis Decl., ¶ 26. The creator of this website, Scott Tesler, described his activities with respect to LowRateAdvisors.net as follows:

> I have registered a domain, "lowrateadvisors.net." For some time this site redirected to Azoogle's web pages, and I drove traffic to Azoogle in this manner, and did so as an Azoogle affiliate.
>
> At one point . . . I copied Azoogle's web page, "lowrateadvisors.com" and published it on the web as "lowrateadvisors.net." . . . I may have generated leads using this page but I cannot recall.

Declaration of Henry M. Burgoyne, III in Support of AzoogleAds.com, Inc.'s Motion for Summary Judgment or on the Alternative Summary Adjudication ("Burgoyne Motion Decl."), Ex. K (Tesler Decl.). According to Azoogle's CEO, Donald Mathis, he became aware of the LowRateAdvisors.net website, for the first time, at his deposition in this action. Mathis Opposition Decl., ¶ 26. Mathis further states that Azoogle neither permitted or approved the creation of LowRateAdvisors.net. *Id.* Soon after Mathis's deposition, Azoogle sent a cease-and-desist order to Tesler. *Id.*, ¶ 27.

According to Azzogle, another "knock-off" web site copied from the lowrateadvisors.com web site was greatratecentral.com. Mathis Motion Decl., ¶ 28. That web site was the subject of an action by the Federal Trade Commission in 2005 against Optin Global, Inc. and three other former defendants in this action ("the FTC" Action). Calpotura Decl., ¶9. Azoogle was not named as a defendant in that action. *Id.*

### 5. ASIS's Anti-Spam Efforts

Regarding the burden that spam has imposed on ASIS, Nella White states as follows:

> ASIS Internet has received an ever-increasing amount of SPAM for the past several years. The cost of processing email and filtering out

6

> SPAM has grown dramatically. ASIS has had to add software,
> hardware, staff, and network bandwith to fight the SPAM. ASIS also
> currently uses a service, POSTINI, to preprocess all of the mail sent to
> its email server, at considerable expense.

White Opposition Decl., ¶ 2.

In her deposition, White estimated that ASIS spends $3,000.00/month on spam filtering and employee time devoted to dealing with spam issues. Declaration of Jason Singleton in Support of Opposition to Azoogle's Motion for Summary Judgment ("Singleton Opposition Dec."), Ex. A (White Depo.) at 223. She also testified that a third of ASIS employee time is spent dealing with spam complaints. Calpotura Opposition Decl., Ex. K (White Depo.) at 90-91, 98-99. However, she explained that the "bulk" of that time is spent dealing "indirectly" with spam complaints, namely, helping people who don't have proper email configurations. *Id.* Later in her deposition, she admitted that she had never been able to get her staff to provide breakdowns of how they spent their time and could not say how much time they spent dealing with spam. Calpotura Opposition Decl., Ex. K (White Depo.) at 99-100. White also testified that ASIS added only one employee during the relevant period, who was not hired to address spam problems but rather, was primarily involved in installing wireless broadband services. *Id.* Supplemental Declaration of Henry M. Burgoyne, III in Opposition to Plaintiff ASIS Internet Services, Inc.'s Motion for Summary Adjudication of Issues ("Burgoyne Supp. Decl."), Ex. A (White Depo.) at 89.

ASIS began using its current spam filtering service, Postini, in 2001. Burgoyne Motion Decl., Ex. S. Postini charges ASIS based on the number of customers who use the service rather than the volume of spam that it filters. Burgoyne Motion Decl., Ex. C (White Depo.) at 219, Ex. S (Postini Contract). Based on Postini invoices, the cost of Postini's services to Azoogle in 2005 was as follows: $465.90 (January 2005); $471.00 (February 2005); $474.00 (March 2005); $462.60 (April 2005); $467.40 (May 2005); $471.00 (June 2005); $474.60 (July 2005); $360.00 (August 2005); $453.00 (September 2005); $457.50 (October 2005); $439.80 (November 2005); $439.80 (December 2005). ASIS's system administrator is Falcon Knight, which has leased two servers to ASIS since 2004 or 2005. Burgoyne Decl., Ex. J (Deposition of Shawn O'Connor) at 18, 55.

### 6. The Bruce Wolf Lead

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Plaintiff's claims arise from a "lead" that ASIS asserts shows that Azoogle was responsible

2    for the initiation of over 12,000 unsolicited email messages, so-called "spam," most of which were

3    sent to the mailboxes of former Azoogle users. The history of this lead, as recounted by Nella

4    White, is as follows. According to Nella White, on the night of October 25-26, 2005, the ASIS

5    email service received many messages regarding real estate financing. Declaration of Nella White in

6    Support of Opposition to Motion to Dismiss ("White Motion to Dismiss Opposition Decl."), ¶ 5.

7    White became aware of these e-mails because many of the emails were sent to addresses that were

8    no longer active. *Id.*, ¶ 5. To see if they were spam, she aliased these addresses to a single account

9    name. *Id.*, ¶ 5. White found that many of the emails directed recipients to URLs in the form

10    xxmort.com or xxmort.net, where the "x" consisted of any number or letter, causing White to

11    conclude that the e-mails were related. *Id.*, ¶ 6. According to White, although the emails directed

12    recipients to a number of different web sites, the various sites were "exactly the same." *Id.*, ¶ 4.

13    On October 27, 2005, White filled out a form on one of these web sites, wumort.net.[3] A

14    "whois" search of the domain name wumort.net indicates that that web site was registered to an

15    individual named John Dillinger with a physical address in Texas. Singleton Opposition Decl., Ex.

16    P. ASIS witness Carl Scoles states in a declaration that the web page White saw on October 27,

17    2005 was "virtually the same" as Azoogle's site, lowrateadvisors.com. Grabowski Decl., Ex. H

18    (Declaration of Carl Scoles (2)).[4] White states that she chose the web site because "it clearly had

19    been sent to a large percentage of my customer base, listed alphabetically, leading me to suspect

20    they had been gathered by means of a Directory Harvest Attack." *Id.*, ¶ 7. White filled in the form

21    on the web page with fictitious information about an individual named "Bruce Wolf." *Id.*, ¶¶ 7-9.

22    She does not state the time at which she uploaded the Bruce Wolf information. *Id.*

23

24    [3] Although White stated in her declaration that she typed the lead into wumort.net, she attached

25    a page to her declaration – purportedly the blank page she typed the lead into – carrying a vcmort.com footer. At oral argument, Plaintiff stated that the web site White actually typed the Bruce Wolf lead into

26    was wumort.net.

27    [4] Scoles explains in his declaration that on July 10, 2007, he discovered a web site titled lowrateadvisors.net which included a link to Azoogles lowrateadvisors.com. According to Scoles, both

28    the dot-com and the dot-net addresses contained images that were identical to the wumort.net website that White says she typed the Bruce Wolf lead into.

United States District Court

For the Northern District of California

1    The telephone number White provided was a real number, attached to an answering machine

2 to record responses to the Bruce Wolf lead. *Id.*, ¶ 9. A transcript of the messages received at the

3 number shows that the next day, Friday October 28, 2005, eight calls were received from mortgage

4 brokers for the fictitious Bruce Wolf, between 10:34 a.m. and 3:25 p.m. Declaration of Teresa

5 Singleton in Support of Opposition to Motion to Dismiss ("Singleton Motion to Dismiss Opposition

6 Decl."), Ex. A (transcript of telephone messages).[5]

7    In a recent declaration, dated January 31, 2008, White stated for the first time that after she

8 submitted the Bruce Wolf information at the wumort.com web site[6] she attempted to submit lead

9 information into another data entry form on a different web site with a similar URL that was also

10 listed in some of the Emails. Declaration of Nella White in Opposition to Azoogle's Motion for

11 Summary Judgment ("White Opposition Decl."), ¶ 2. White's declaration does not reveal the URL

12 of this web site. She used new fictitious information but the same telephone number and received an

13 error message stating that the submission had been rejected due to duplicate field information. *Id.*

14

15    Declaration of Richard E. Grabowski in Support of Motion for Summary Adjudication of

16 Issues ("Grabowski Motion Decl."), Ex. I at AZ 22. According to Azoogle, it received the lead from

17 Seamless Media Corp. ("Seamless Media"). Grabowski Motion Decl., Ex. R (Azoogle interrogatory

18 responses).

19

20    Grabowski Motion Decl., Ex. I

21 (Insertion Order) at AZ 5.

22

23    *Id.* at AZ 20.

24

---

25    [5] Plaintiff asserts that from these messages, Plaintiff's attorneys were able to identify nine

26 separate mortgage companies who were responding. Plaintiff's Motion at 2. It is unclear how
Plaintiff's attorneys arrived at this figure, as only eight messages were recorded, and of the eight

27 messages, four were left by two mortgage brokers, both of whom left two messages.

28    [6] Presumably, White meant wumort.*net* rather than wumort.*com*.

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

2   at AZ 5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮) Singleton Opposition Decl., Ex. D (Mossanen Depo.) at 55.

4   According to Jay Williams, a principal at Seamless Media, at the time it provided the Bruce

5   Wolf lead to Azoogle, Seamless purchased all of its leads from third parties. Burgoyne Motion

6   Decl., Ex. M (Declaration of Jay Williams, dated December 10, 2007) ("First Williams Decl."), ¶ 17.

7   According to Williams, it was not uncommon for a lead to travel through several parties before it

8   reached Seamless Media. *Id.* Williams further states that at the time Azoogle and Seamless Media

9   had entered into the Insertion Order, Seamless Media had a good reputation, had never been accused

10  of violating the CAN-SPAM Act and had never been listed on ROKSO. *Id.*, ¶ 19. Seamless Media

11  obtained the Bruce Wolf lead from a third-party vendor of mortgage leads, Scribe Interactive

12  ("Scribe"), which, according to Williams, also had a good reputation in the mortgage lead industry.

13  *Id.*, ¶ 22. In response to an inquiry to Scribe regarding the Bruce Wolf lead, the president of Scribe,

14  Steve Soffer, stated that one of *Scribe's* vendors had obtained the lead from an individual named

15  John Stothers. Burgoyne Decl., Ex. N (Declaration of Jay Williams, dated December 11, 2007)

16  ("Second Williams Decl."), Ex. A. (November 7, 2005 email from Steve Soffer to Jay Williams

17  regarding source of Bruce Wolf lead).

18  According to Azoogle, it sold the Bruce Wolf lead to another lead aggregator, eLeadZ, as

19  well as to Quicken Loans. *See* Grabowski Motion Decl., Ex. D (Azoogle's Response to request for

20  Admission, No. 22 and Amended Admission No. 19).[7] The code that accompanied the lead when it

21  was sent to Quicken Loans reflects the "lead type" as AZIQL. Grabowski Motion Decl., Ex. F.

22  According to ASIS, this indicates that the lead came from LowRateAdvisors.com. Plaintiff's

23  Motion at 3.[8]

24

25      [7]ASIS also asserts the lead was sold to Aegis Lending but does not cite any evidence in support
26  of that assertion. *See* Plaintiff's Motion at 2.

27      [8] At oral argument, Azoogle stipulated that the AZIQL code referred to Azoogle's web site
   lowrateadvisors.com. According to Azoogle, this code does not indicate that the lead actually came
28  from lowrateadvisors.com but rather, reflects that the lead conforms to the offer criteria in relation to
   which Quicken sought to purchase leads from Azoogle.

United States District Court
For the Northern District of California

1    On November 2, 2005, Quicken Loans contacted Azoogle to learn more about the Bruce
2  Wolf lead, stating that it received an inquiry from an attorney who represented a consumer who had
3  received spam and had been referred to Quicken Loans by Azoogle. Declaration of Jason Singleton
4  in Opposition to Motion for Summary Judgment ("Singleton Opposition Decl."), Ex. G at QL 84-85.
5  On November 8, 2005, Azoogle responded, stating "the affiliate that provided Azoogle the lead" was
6  John Stothers. *Id.*

7              **7.    The Emails**

8    Plaintiff alleges that Defendants sent over 10,000 deceptive and unsolicited emails ("the
9  Emails") to ASIS's server during the period between October 25, 2005 and November 14, 2005.
10  SAC at 7. The Emails were provided to the Court in electronic form. Declaration of Nella White in
11  Support of Plaintiff's Motion for Summary Adjudication of Issues ("White Motion Decl."), Ex. E.
12  According to ASIS, all of the Emails were sent to accounts at asis.com. White Motion to Dismiss
13  Opposition Decl., ¶ 5. They were obtained by ASIS by aliasing emails directed to former user
14  addresses to an account for a user identified as "ng." Declaration of Dr. Frederick B. Cohen in
15  Support of AzoogleAds.com, Inc.'s Motion for Summary Judgment or in the Alternative Summary
16  Adjudication ("Cohen Decl.") at 5. Based on documents provided to Azoogle by ASIS vendor,
17  Falcon Knight, Azoogle's expert, Frederick Cohen, has concluded that the email addresses of 1,507
18  ASIS former users were aliased to the ng account. *Id.*

19    According to Cohen, in order for the emails at issue in this case to be sent to the ng account,
20  ASIS must have paid Postini for these accounts, as Postini would have sent a notice to senders that
21  the addresses were invalid if the fee had not been paid. *Id.* at 6. In addition, if the accounts had not
22  been aliased, ASIS's server would have produced error messages informing senders that the
23  accounts were not active and valid. *Id.* Further, Cohen posits that ASIS likely altered its spam
24  filtering to allow the emails to come through, as Postini would almost certainly have filtered the
25  emails if ASIS had not done so. *Id.*

26    The parties disagree with respect to the number of emails at issue. According to ASIS's
27  investigator, Josh Mohland, there at 12,756 emails at issue. Grabowski Motion Decl., Ex. T
28  (Declaration of Josh Mohland) at 1. According to Azoogle's expert, Frederick Cohen, the emails at

United States District Court
For the Northern District of California

11

1 issue consist of 1,421 individual messages, some or all of which were sent to multiple addresses.

2 Cohen Decl. at 7. According to Cohen, many of the Emails were not received during the period

3 alleged in the complaint. *Id.* at 7-8; *see also* Cohen Decl., Ex. B (Supplementary Disclosures) at 14

4 (stating that Emails contained date and time stamps). ASIS asserts, however, that Cohen's opinion

5 is not valid with respect to the date stamps, pointing to Nella White's statement that the ASIS's

6 "Postfix" system wasn't in place in 2005. *See* ASIS Reply at 3 (citing Declaration of Nella White in

7 Opposition to Azoogle's Motion for Summary Judgment ("White Opposition Decl."), ¶ 5).

8 According to ASIS investigator, Carl Scoles, 110 different subject lines were used in the

9 Emails and 9,737 of the Emails contain "bad" subject lines. Grabowski Decl., Ex. H (Scoles (2)

10 Decl.) at ¶ 3 & Ex. A-2. According to Mohland, all of the Emails contain false headers, a conclusion

11 that is based on Mohland's comparison of the IP addresses of the sender of the Emails with the

12 domain names listed in the message ID or From: header. Grabowski Motion Decl., Ex. T

13 (Declaration of Josh Mohland) at 2. To determine the registrants of IP addresses, Mohland used the

14 ARIN "whois" database. *Id.* at 5. Relying, in part, on Mohland's conclusions, ASIS expert Jeffrey

15 Posluns also concluded that the header information was false. Posluns explained his conclusions as

16 follows:

17          In many of the emails, the sending IP address' reverse DNS
            information does not match the sender's email domain name nor does
18          it match the domain name with which the sending host identifies itself.
            While this may occur in some virtual hosting environments, many of
19          the IP addresses belongd to the computers of individuals making use
            of a standard internet provider to access the internet. This indicates
20          that the header information is false. This false information was
            generated at the time that the emails were sent using a program that
21          specifically generates false header information while sending emails.

22          An investigation of the IP addresses in the email headers indicates that
            the emails were sent or relayed from individual computers making use
23          of standard internet service providers for access to the internet. In
            order to send out the subject emails, these computers would have been
24          infected with a malicious code (commonly referred to as a virus,
            Trojan, or botnet application) and made members of a botnet. The use
25          of a botnet conceals the true sender of the emails from the receiving
            ISP.

26

27 Grabowski Motion Decl., Ex. M (Plaintiffs' Expert Witness Disclosure of Jeffrey Posluns) at 6-7.

28

United States District Court
For the Northern District of California

1  Azoogle's expert, however, questions the validity of the Mohland's study and Poslun's

2  conclusions. He states that "IP address data available through a whois lookup does not reliably

3  indicate IP address use." Cohen Decl., ¶ 58. He further states it is common that a sender's actual

4  identity does not correspond to host data pertaining to the IP address of the email server from which

5  the sender transmits the emails. Cohen Decl., ¶ 59. Cohen concludes, Mohland's "method of

6  inferring a sender based on host data pertaining to the IP address of the server from which an email

7  is transmitted is inherently unreliable and is not based on any generally accepted forensic

8  methodology." *Id.* He also states that the Emails could have been sent using an Anonymizer or an

9  Onion Router rather than a botnet. *Id.*, ¶¶ 29-30.

10  According to ASIS's expert, Posluns, and investigators Scoles and Mohland, a connection

11  between the Emails can also be found on the basis of the facts that the URLs referenced in the emails

12  contain a number of identical images. Posluns explains as follows:

13      An analysis of the IP addresses for the landing pages of the URLs
        contained in the subject emails clearly show the landing pages are
14      connected. The URL in 5,569 of the subject emails open an identical
        page, or a page containing identical images to those seen at
15      WUMORT.NET – the page that Nella White used to enter the "Bruce
        Wolf" lead in October of 2005. Of the 5,569 emails, 4,217 linked to
16      an identical page as that seen by Nella White in October 2005. The
        other 1,352 linked to pages containing at least 6 of the same image
17      files used in the wumort.net web page. When a comparison of the IP
        addresses of the URL links were made, a connection became apparent
18      between the 92 web domains in 11,418 of the subject emails.

19      The probability is extremely remote that landing pages from different
        emails will contain the same images and be housed on a newtork of the
20      same IP addresses and not be from the same source. There are some
        four trillion possible IP addresses on the Internet, making coincidences
21      relating to IP addresses very unlikely.

22  Grabowski Motion Decl., Ex. W (Plaintiffs' Expert Witness Disclosure of Jeffrey Posluns) at 9-10.

23  *See also* Grabowski Decl., Ex. S (Declaration of Carl Scoles re Supplemental Disclosure Six

24  Amended), ¶ 15 & Ex. 5 thereto. Scoles also concludes, based on similar words and phrases used in

25  many of the Emails, that they came from the same source. *See* Grabowski Decl., Ex. H at 3.

26  Posluns does not state in his expert disclosures that he relied on the Wayback Machine for

27  images of the web sites referenced in the Emails. However, ASIS states in its Opposition that this is

28  how the comparison was made. ASIS Opposition at 22. Scoles also states in his study that he relied

13

1   on the Wayback Machine. *See* Grabowski Decl., Ex. H at 2. Azoogle's expert, Frederick Cohen,
2   however, states that the Wayback Machine is not an accurate representation of historical Web
3   content and cannot be relied on for forensic purposes. Cohen Decl., ¶¶ 49-50.

4          The parties agree that the Emails didn't contain physical opt-out addresses. Joint Statement
5   of Stipulated Facts, No. 5. With respect to the question of whether the Emails contained valid
6   electronic opt-out links at the time they were sent, ASIS witness Carl Scoles concludes that some of
7   the Emails contained no unsubscribe links and the unsubscribe links contained in many of the
8   Emails are either questionable or invalid. Grabowski Decl., Ex. H (Declaration of Carl Scoles (2)) at
9   ¶ 4 & Ex. A-1. However, with respect to the allegedly questionable and invalid links, ASIS
10  admitted in interrogatory responses that "it cannot determine if any of these email unsubscribe
11  functions ever actually worked." Burgoyne Decl., Ex. P.

12         According to ASIS witness Scoles, the Emails contained at least 110 different web domain
13  titles. *Id.* at 1. Azoogle, in turn, presents evidence that 81 of these URLs were owned by n
14  individual named Alex Polyakov in 2005-2006. Declaration of Adam Schneider in Opposition to
15  Plaintiff ASIS Internet Services, Inc.'s Motion for Summary Adjudication of Issues ("Schneider
16  Opposition Decl."), ¶ 3.

17  **B.    Plaintiff's Claims and Azoogle's Defenses**

18         In its Second Amended Complaint, Plaintiff asserts a federal law claim under the CAN-
19  SPAM Act of 2003, 15 U.S.C. §§ 7701 *et seq.*, and a state law claim based on California Business
20  and Professions Code § 17529.5. Plaintiff's CAN-SPAM Act claim is based upon the following
21  specific alleged violations: 1) 15 U.S.C. § 7704(a)(1), prohibiting the transmission of email
22  messages with false or misleading header information, based on the allegations that the Emails were
23  sent using stolen or hijacked Email identities and that they included domain names that were
24  registered to unknown and false entities; 2) 15 U.S.C. § 7704(a)(2), prohibiting the transmission of
25  email messages with deceptive subject headings, based on the allegation that the subject lines in the
26  Emails were intended to get someone to open the messages by telling them their loan was approved;
27  the misspellings in the email subject lines were also misleading, ASIS alleges, because they were
28  intended to evade Plaintiff's spam blocking hardware; 3) 15 U.S.C. § 7704(a)(3), requiring the

14

**United States District Court**
For the Northern District of California

1   inclusion in commercial electronic email of a valid electronic opt-out link; 4) 15 U.S.C.

2   § 7704(a)(5), requiring the inclusion in commercial email addresses of a valid physical postal

3   address of a sender; 5) 15 U.S.C. § 7704(b)(1), establishing that CAN-SPAM Act violations shall be

4   considered "aggravated violations" if the email address of the recipient was obtained through

5   directory harvests or dictionary attacks; and 6) 15 U.S.C. § 7704(b)(2), establishing an aggravated

6   violation where the email addresses were obtained using automated tools or scripts.

7       Azoogle, in turn, asserts the following eleven affirmative defenses: 1) ASIS has failed to

8   state a cause of action upon which relief may be granted; 2) with respect to the California state law

9   claim, ASIS assumed the risk and contributed to its own damages; 3) the allegations in the complaint

10  fail to confer personal jurisdiction over Azoogle; 4) any loss, injury, or damage ASIS incurred was

11  proximately caused by third parties or non-parties whom Azoogle neither controlled nor had the

12  right to control; 5) ASIS's claims are barred by the doctrine of unclean hands and therefore ASIS

13  should be estopped from bringing this lawsuit; 6) ASIS failed to mitigate its damages; 7) damages

14  were proximately caused by ASIS and therefore require an allocation of fault; 8) ASIS consented to

15  the acts of Azoogle alleged in the complaint; 9) ASIS waived any claim against Azoogle alleged in

16  the complaint; 10) ASIS has failed to bring this action in the appropriate venue; 11) ASIS's claims

17  are barred under the doctrine of preemption. Answer to Amended Complaint, Docket No. 134.

18      **C.   The Motions**

19          **1.   ASIS Motion**

20      ASIS seeks summary judgment in its favor with respect to eight of Azoogle's affirmative

21  defenses as well as five issues that are key to ASIS's claims. ASIS asserts that it is entitled to

22  summary judgment on the following affirmative defenses:

23      Assumption of risk: ASIS argues that the affirmative defense of assumption of risk does not

24  apply to Plaintiff's claims because that doctrine applies to negligence claims, not statutory claims as

25  are asserted here.

26      Loss caused by third parties: ASIS argues that this defense fails because it is based on

27  negligence concepts of proximate causation and control, whereas the statutory claims asserted by

28

United States District Court
For the Northern District of California

1  ASIS turn on whether Azoogle "procured" the Emails. This standard, ASIS asserts, does not turn on
2  control or proximate causation.

3      Unclean hands: ASIS asserts that its conduct – and particularly, its actions that allowed it to
4  receive the Emails, namely, aliasing former user accounts and altering its spam filters – does not
5  amount to unclean hands and that assertion of this affirmative defense is an attempt to place the
6  burden of receiving spam on the recipient.

7      Failure to mitigate damages: ASIS argues that the doctrine of mitigation of damages does
8  not apply to either of its claims, citing *Phillips v. Netblue, Inc.*, 2006 WL 3647116 (N.D. Cal.).

9      Damages caused by ASIS: ASIS argues that the affirmative defense that damages were
10  proximately caused by ASIS is based on tort concepts that are not applicable to Plaintiff's statutory
11  claims.

12      ASIS invited or consented to alleged acts of Azoogle: ASIS argues that there is no legal or
13  factual basis for Azoogle's consent affirmative defense because Azoogle has presented no evidence
14  that the Emails were solicited by the intended recipients.

15      Waiver: ASIS challenges Azoogle's waiver affirmative defense, arguing that Azoogle has
16  not explained the basis for this affirmative defense.

17      Preemption: ASIS argues that this affirmative defense fails because although the CAN-
18  SPAM Act contains a preemption clause, 15 U.S.C. § 7707(b), it also contains a savings clause
19  which permits state laws that prohibit conduct in cyberspace that sounds in fraud. According to
20  ASIS, its state law claim sounds in fraud and therefore is not preempted

21      In addition to Azoogle's affirmative defenses, ASIS seeks summary judgment on a number
22  of issues related to its claims. The issues on which ASIS seeks summary judgment are as follows:

23      Whether ASIS is an Internet Access Provider ("IAS") as defined under the CAN-SPAM Act
24  and an electronic mail service provider under California law: ASIS argues that it is entitled to
25  summary judgment that it is an Internet Access Provider as that term is defined under the CAN-
26  SPAM Act and further, that it is an electronic mail service provider under California Business and
27  Professions Code § 17529.1(h).

28

16

United States District Court

For the Northern District of California

1    <u>Whether the Emails were sent to or transmitted to ASIS email accounts</u>: ASIS argues that

2   there is no issue of material fact regarding whether the Emails were sent or transmitted to ASIS

3   email accounts, pointing to evidence that the Emails all contain "@asis.com" in the address.

4    <u>Whether the Emails contained false header information</u>: ASIS asserts that it can be

5   established, as a matter of law, that the headers on the Emails are false under both the CAN-SPAM

6   Act and Cal. Bus. & Prof. Code § 17529.5. First, it asserts that by comparing the originating source

7   IP address (in the email's header information) and the sending email domain names, it can be

8   established that the headers on the Emails are false. According to ASIS, this is because it is an

9   accepted industry standard that the sending domain name must match the sending IP address. Using

10   this standard, ASIS witness Josh Mohland has conducted a study on the basis of which he concludes

11   the Email headers are false. Second, ASIS argues that the DomainKey authentication system is also

12   an industry standard that can be used to show the Email header information is false. According to

13   ASIS, the DomainKey authentication system was created by Yahoo and requires that a DomainKey

14   authentication code be included in the header of every email. Mohland concludes in his study that

15   the absence of such a DomainKey authorization code in the headers of most of the Emails indicates

16   that the headers are false and misleading. Finally, ASIS asserts that all of the Emails were sent in a

17   nonrandom fashion from different computers in alphabetical order of intended recipients and that the

18   contents of the Emails were very similar, supporting the conclusion that the Emails were sent by a

19   "botnet" that hijacked the computers of individual users to send the spam.

20    <u>Whether the Emails contain false or misleading subject lines</u>: Citing to a declaration by ASIS

21   witness Carl Scoles, who reviewed the Emails and classified their subject lines, ASIS asserts that

22   there is no dispute that 9,737 of the emails have false or misleading subject lines under both the

23   CAN-SPAM Act and Cal. Bus. & Prof. Code § 17529.5.

24    <u>Whether the Emails contained a valid unsubscribe option</u>: ASIS asserts, based on the study

25   of Carl Scoles, that none of the Email contain a physical unsubscribe address and 12,625 of the

26   Emails don't contain a valid unsubscribe link.

27

28

17

United States District Court
For the Northern District of California

1       ### 2.   Azoogle Opposition to ASIS Motion

2           Azoogle objects to evidence that ASIS cited in its Motion and also asserts that ASIS should

3   be barred from presenting evidence relating to various issues with respect to which ASIS failed to

4   produce – or in some cases, preserve – relevant evidence.  As noted above, the Court declines to

5   rule on Azoogle's objections because this evidence, even if admissible, does not change its result.

6           Next, Azoogle argues that ASIS should not be allowed to use a summary judgment motion to

7   establish specific factual issues rather than to determine entire claims.

8           On the merits, Azoogle makes the following arguments with respect to the issues on which

9   ASIS seeks summary judgment:

10          Whether ASIS is an Internet Access Service ("IAS") as defined under the CAN-SPAM Act

11  and an electronic mail service provider under California law: Although Azoogle has stipulated both

12  that ASIS is an IAS as that term is defined under the CAN-SPAM Act and that it is an electronic

13  mail service provider under California Business and Professions Code § 17529.1(h), it argues

14  nonetheless that ASIS was not *acting* as an IAS or an electronic mail service provider when it

15  intercepted the email of its former users.  Azoogle further asserts that ASIS lacks standing under the

16  CAN-SPAM Act because it has not been "adversely affected" by the alleged violations, as required

17  under 15 U.S.C. § 7706(g)(1).  In support of this position, Azoogle cites *Gordon v. Virtumondo,*

18  *Inc.*, 2007 WL 1459395 (W.D. Wash. May 15, 2007).  Azoogle also argues that it wasn't an

19  electronic mail service provider under California law because Postini likely filtered out the spam

20  and, therefore, with respect to the Emails, ASIS was not an intermediary in sending and receiving

21  email as required under California law.

22          Whether the Emails were sent to or transmitted to ASIS email accounts: Azoogle does not

23  address ASIS's argument that it is entitled to summary judgment that the Emails were sent or

24  transmitted to ASIS email accounts.

25          Whether the Emails contained false header information: Azoogle rejects ASIS's evidence in

26  support of summary judgment, arguing that neither Mohland nor Scoles is an expert and that the

27  methodologies used by both are flawed.  Azoogle cites to its own expert's testimony that there is no

28

industry standard regarding email authentication. It also challenges the evidence that underlies the conclusion that a botnet was used to send the Emails.

Whether the Emails contain false or misleading subject lines: Azoogle argues that ASIS's position on this issue fails because it is based on the opinion of a lay witness, Carl Scoles, who didn't tie his findings to particular emails. In any event, Azoogle argues, many of the subject lines (e.g., "Excellent mortgagee [sic]," "Offering funding," "Pre-aprovedd [sic] rate" are not likely to mislead a recipient within the meaning of 15 U.S.C. § 7704(a)(2).

Whether the Emails contained a valid unsubscribe option: Azoogle does not dispute that the Emails don't contain physical unsubscribe addresses but challenges ASIS's position with respect to the unsubscribe links, pointing to ASIS's stipulation that it does not know if the links ever worked.

With respect to ASIS's arguments regarding Azoogle's affirmative defenses, Azoogle expressly addresses only two of them in its Opposition: the unclean hands and consent affirmative defenses.[9] Regarding the unclean hands affirmative defense, Azoogle argues that ASIS has systematically violated the statutory privacy rights of users, former users and third parties in order to obtain millions of dollars through litigation and that ASIS should not be permitted to profit from this conduct in this litigation. Azoogle asserts that its consent affirmative defense should not be stricken because ASIS consented to receipt of the Emails by aliasing former user names and altering spam filters to allow the Emails to be sent.

### 3.   Azoogle Motion

In its Motion, Azoogle seeks summary judgment on the following grounds:

Lack of standing to assert CAN-SPAM Act claim: Azoogle argues that ASIS does not have standing to assert a CAN-SPAM Act claim because there is no evidence that it was adversely affected by the Emails and because ASIS was not acting as an IAS when it collected the Emails.

Lack of evidence that Azoogle "procured" the Emails: Azoogle argues that it can only be liable under the CAN-SPAM Act if it is shown to have "procured" the transmission of the spam and

---

[9] The Court notes, however, that Azoogle's failure to address the preemption affirmative defense in its Opposition appears to have been an oversight as Azoogle did raise this issue in its own summary judgment motion, as discussed below.

United States District Court
For the Northern District of California

1  that ASIS has presented no evidence sufficient to create a jury question on this issue. Azoogle
2  points in particular to 15 U.S.C. § 7706(g)(2), which specifies that an Internet Access Service
3  provider may only sue as a private attorney general if Azoogle initiated the Emails "with actual
4  knowledge, or by consciously avoiding knowing" that it was inducing another person to violat the
5  CAN-SPAM Act. Azoogle further asserts that undisputed evidence shows that it did not know and
6  could not have known that Seamless media would engage in a pattern or practice of violating the
7  CAN-SPAM Act.

8      Lack of evidence of CAN-SPAM Violations: Azoogle argues that ASIS has pointed to no
9  significant, probative evidence of any CAN-SPAM violations and therefore, Plaintiff's CAN-SPAM
10 Act claim should be dismissed. First, Azoogle argues that the evidence shows no actionable emails.
11 In support of this contention, Azoogle points to evidence that only 242 of the Emails were sent
12 during the relevant time period; of these, only 109 were directed at then-current ASIS users, while
13 the remaining e-mails were sent to the ng mailbox. The latter, Azoogle argues, were not actually
14 transmitted to the former users' mailboxes and therefore do not conform with the CAN-SPAM Act's
15 definition of "electronic mail messages." As to the former, Azoogle asserts, of the 109 emails, 11
16 were duplicates created by ASIS's aliasing mechanism, leaving 98 emails. Counting all then-current
17 ASIS users listed in these messages, Azoogle argues, 175 email messages directed to then-current
18 users. These, however, were likely filtered out by Postini and thus probably were not received by
19 any ASIS users.

20     Second, Azoogle rejects the analysis of Plaintiff's investigator Mohland on the question of
21 whether the header information in the Emails is materially false. Mohland completed a study
22 comparing domain names and IP addresses in the Emails that was disclosed to Azoogle in response
23 to the contention interrogatories (discussed above). Azoogle argues that the study is flawed in
24 numerous respects, including Mohland's reliance on "whois" lookups, his use of 2007 registration
25 data rather than data pertaining to the period in which the Emails were sent and his use of a flawed
26 methodology.

27
28

United States District Court
For the Northern District of California

1    Third, Azoogle argues that there is no significant probative evidence that the Emails were

2    sent using a "directory attack" to gather ASIS user addresses, and therefore ASIS's assertion that the

3    alleged violations were "aggravated violations" under 15 U.S.C. § 7704(b)(1)(A) fails.

4    Deficiencies relating to Cal. Bus. & Prof. Code Claim § 17529.5: Azoogle argues that ASIS

5    was not an electronic mail service provider under California law for the same reasons it lacks

6    standing under the CAN-SPAM Act, namely, that the Emails were likely filtered by Postini and did

7    not reach any active users. Second, Azoogle argues that ASIS fails to offer any specific probative

8    evidence that Azoogle had anything to do with the initiation of the Emails and therefore, it cannot be

9    established that Azoogle is an "advertiser" under Section 17529.1. Third, Azoogle argues that ASIS

10   fails to offer any specific probative evidence that the Emails contained falsified, misrepresented, or

11   forged header information. Finally, Azoogle argues that the Section17529.5 claim is preempted by

12   the CAN-SPAM Act because it does not sound in tort, citing *Klefman v. Vonage Holdings Corp.*,

13   2007 WL 1518650 (C.D. Cal. May 23, 2007).

14   Evidence relating to Unclean Hands and Consent: Azoogle argues that the Court should grant

15   summary judgment in its favor based on its unclean hands and consent affirmative defenses for the

16   same reasons discussed above in connection with Azoogle's Opposition to ASIS's summary

17   judgment motion.

18              **4.    ASIS Opposition**

19        ASIS responds to Azoogle's arguments as follows:

20        Standing: ASIS argues that Azoogle's arguments regarding standing are flawed. First, ASIS

21   argues that the assertion that ASIS was not acting as an IAS because it was acting to gather evidence

22   by collecting the Emails in the ng mailbox is contradicted by 15 U.S.C. §7707(c), which provides

23   that:

24              [n]othing in this chapter shall be construed to have any effect on the
              lawfulness or unlawfulness, under any other provision of law, of the
25              adoption, implementation, or enforcement by a provider of Internet
              access service of a policy of declining to transmit, route, relay, handle,
26              or store certain types of electronic mail messages.

27   15 U.S.C. §7707(c). Second, ASIS argues that the adverse effects test adopted in *Gordon*, cited by

28   Azoogle, is likely incorrect, citing language in the Act's statutory damages provision that allows for

21

1 || damages not only for messages that are "transmitted" but also for those that are "attempted to be

2 || transmitted." 15 U.S.C. § 7706(g)(3)(A). Third, ASIS argues that in any event, ASIS has

3 || established adverse effects under *Gordon*.

4 ||     Whether Azoogle "procured" the Emails: ASIS argues that Azoogle has overstated the

5 || "consciously avoiding knowing" requirement in 15 USC § 7706(g)(2) and that evidence that

6 || Azoogle knew its third-party vendor regularly hired spammers to obtain leads – even if Azoogle was

7 || not aware of who actually sent the spam – is sufficient to meet this test. In support of this position,

8 || ASIS points to the following evidence:

9 || •    the Insertion Order between Azoogle and Seamless media specifically permitted the use of

10 ||     email to generate leads, indicating that Azoogle and Seamless were engaged in joint internet

11 ||     marketing using email.

12 || •    Azoogle's November 8, 2005 email to Quicken loans referred to John Stothers as an affiliate,

13 ||     rather than as an "affiliate's affiliate," indicating that Stothers was an Azoogle affiliate.

14 || •    The code in the lead that was sent to Quicken Loans designated the lead as coming from

15 ||     lowrateadvisors.com.

16 || •    The lowrateadvisors.com's web page was almost identical to the web page White completed,

17 ||     which was referenced in the Emails, indicating that Azoogle knew about the web sites

18 ||     referenced in the Emails and was aware the Emails were being sent to generate leads.

19 || •    Evidence that ASIS asserts shows that the Bruce Wolf lead was transmitted through

20 ||     Azoogle's Lead Agent system in real time, indicating that the wumort.net page was

21 ||     configured in advance so at to link up with Azoogle's Lead Agents system.

22 || •    Testimony of Julian Mossanen regarding white labeling, which ASIS asserts shows that

23 ||     Azoogle permitted its web pages to be copied in order that these vendors could generate

24 ||     leads for Azoogle.

25 || •    The statement by White in her January 31, 2008 Declaration that when she tried to enter

26 ||     fictitious information into another web site referenced in the Emails using the same

27 ||     telephone number she had used for "Bruce Wolf" she received an error message, indicating

28 ||     that both web sites were linked through Azoogle's Lead Agents system.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   •   Testimony by Julian Mossanen and others at Azoogle indicating that Azoogle did not

2       investigate its third-party vendors before entering into insertion agreements with them and

3       did not have any official policy for ensuring that its vendors did not use spam to generate

4       leads.

5   •   The conclusions of investigators Mohland and Scoles and expert Posluns that the Emails

6       were all sent by the same entity.

7       <u>Sufficiency of ASIS's Cal. Bus. & Prof. Code Claim § 17529.5</u>: ASIS rejects Azoogle's

8   argument that it doesn't have standing to assert a claim under Cal. Bus. & Prof. Code Claim §

9   17529.5, pointing out that Azoogle has already stipulated that ASIS is an electronic mail service

10  provider under California law.  Second, ASIS argues that to the extent Azoogle procured the Emails

11  by entering into the Insertion Order with Seamless Media, it is an advertiser under California law.

12  Third, ASIS argues that its shown that the Emails contain false and deceptive headers.  Finally,

13  ASIS asserts that the state law claim is not preempted under *Klefman v. Vonage Holdings Corp.*,

14  2007 WL 1518650 (C.D. Cal. May 23, 2007) because the claim sounds in fraud.

15      <u>Unclean Hands and Consent</u>: For the reasons stated in ASIS's Motion, ASIS asserts that both

16  the unclean hands and consent affirmative defenses fail.

17  **III.    ANALYSIS**

18      **A.    Legal Standard Applicable to Summary Judgment Motions**

19      Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

20  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

21  any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

22  P. 56(c).  In order to prevail, a party moving for summary judgment must show the absence of a

23  genuine issue of material fact with respect to an essential element of the non-moving party's claim,

24  or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex*

25  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Further, "*Celotex* requires that for issues on which the

26  movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

27  genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

28  bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

                                                    23

1   *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993).  Once the movant has made this

2   showing, the burden then shifts to the party opposing summary judgment to designate "specific facts

3   showing there is a genuine issue for trial."  *Id.* at 323.  On summary judgment, the court draws all

4   reasonable factual inferences in favor of the non-movant.  *Anderson v. Liberty Lobby Inc.,* 477 U.S.

5   242, 255 (1986).[10]

6   **B.     The CAN-SPAM Act Claim**

7          The parties have raised a multitude of issues in their motions.  The Court finds that two of

8   those issues are dispositive of Plaintiff's CAN-SPAM Act claim: 1) whether ASIS has standing

9   under the CAN-SPAM Act; and 2) whether there is evidence from which a reasonable jury could

10  conclude that Azoogle "procured" the Emails that are the subject of this action.  With respect to both

11  questions, the evidence presented by the parties was voluminous.  In addition, the case law regarding

12  the relevant legal standards was scant due to the fact that the CAN-SPAM Act was enacted so

13  recently.  As a result, resolutions of these issues was difficult, presenting close calls.  Nonetheless,

14  the Court concludes that the answer to both questions is "no."  As a result, Azoogle is entitled to

15  summary judgment in its favor on Plaintiff's CAN-SPAM Act claim.

16         **1.     Standing Under the CAN-SPAM Act**

17         Azoogle asserts that it is entitled to summary judgment that ASIS has no standing under the

18  CAN-SPAM Act.  The Court agrees.

19         The CAN-SPAM Act allows an IAS to bring an action for injunctive relief or damages for

20  where it is "adversely affected" by a violation of sections 7704(a)(1), 7704(b), or 7704(d) of the Act.

21  ───────────────

22  [10] The parties dispute whether it is permissible to seek summary judgment as to discrete issues
    rather than claims.  There is a split of authority on this question, which has not been addressed by the

23  Ninth Circuit. *See SEC v. Thrasher*, 152 F. Supp. 2d 291, 295 (S.D.N.Y. 2001) (holding that summary
    judgment motion by plaintiff was improper because it requested disposition of elements of a claim rather

24  than judgment on the claim as a whole); *Arado v. General Fire Extinguisher Corp.*, 626 F. Supp. 506,
    509 (N.D. Ill. 1985) (same); *G &C Auto Body, Inc. v. GEICO General Ins. Co.*, 2007 WL 4350909

25  (N.D. Cal. December 12, 2007). *But see Barker .v Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981)
    (summary judgment may be appropriate as to issues as well as claims); *McDonnell v. Cardiothoracic*

26  *& Vascular Surgical Associates, Inc.*, 2004 WL 1234138 (S.D. Oh. May 27, 2004) (same).  While the
    court finds

27  persuasive the reasoning in *McDonnell*, in which the court concluded that parties should be permitted
    to seek summary judgment on discrete issues under some circumstances, it need not resolve this issue

28  because it concludes that Azoogle is entitled to summary judgment on its CAN-SPAM Act claim.
    Therefore, the Court does not reach Plaintiff's request for summary judgment on specific issues.

*(left margin, vertical)* **United States District Court** For the Northern District of California

United States District Court
For the Northern District of California

1   15 U.S.C. § 7706(g)(1). In *Hypertouch, Inc. v. Kennedy-Western University*, 2006 WL 648688

2   (N.D. Cal. March 8, 2006), the court held, on summary judgment, that the "adversely affected"

3   requirement was met where an IAS submitted a declaration "indicating that high spam loads ha[d]

4   caused decrease server response and crashes, led to higher bandwidth utilization, and forced

5   expensive hardware and software upgrades." *Id.* at * 4.

6          In contrast, in *Gordon v. Virtumundo, Inc.*, 2007 WL 1459395 (W.D. Wash. May 15, 2007),

7   the court found that the plaintiff was not adversely affected, even though it provided email service

8   and its users received spam, explaining its conclusion as follows:

9          Plaintiffs undisputedly have suffered no harm related to bandwidth,
           hardware, Internet connectivity, network integrity, overhead costs,
10         fees, staffing, or equipment costs, and they have alleged absolutely no
           financial hardship or expense due to e-mails they received from
11         Defendants. Plaintiffs have spam filters available to them, and such
           filters continue to become more sophisticated. Nor do Plaintiffs allege
12         that they use "dial-up," the costs associated with which were
           specifically discussed by Congress (and likely are becoming an
13         obsolete concern as high-speed broadband usage becomes the norm).
           Moreover, even if there is some negligible burden to be inferred from
14         the mere fact that unwanted e-mails have come to Plaintiffs' domain, it
           is clear to the Court that whatever harm might exist due to that
15         inconvenience, it is not enough to establish the "adverse effect"
           intended by Congress. Indeed, the only harm Plaintiffs have alleged is
16         the type of harm typically experienced by most e-mail users. The fact
           that Congress did not confer a private right of action on consumers at
17         large means that "adverse effect" as a *type* of harm must rise beyond
           the level typically experienced by consumers- *i.e.,* beyond the
18         annoyance of spam.

19   *Id.* at * 8.  In support of this conclusion, the *Gordon* court looked to the legislative history of the

20   CAN-SPAM Act and in particular, the burden imposed by spam on internet access providers:

21         In the Committee Report, under the heading "Costs to ISPs,
           Consumers, and Businesses," the Senate Committee on Commerce,
22         Science, and Transportation found that "[s]pam imposes significant
           economic burdens on ISPs, consumers and businesses" because
23         "[m]assive volumes of spam can clog a computer network, slowing
           Internet service for those who share that network. ISPs must respond
24         to rising volumes of spam by investing in new equipment to increase
           capacity and customer service personnel to deal with increased
25         subscriber complaints." S. REP. NO. 108-102, at 6 (2003) (Comm.
           Rep. on CAN-SPAM Act of 2003 (S.877)). "Dictionary attacks" can
26         hijack a server, slowing it and making it appear that legitimate users
           are sending spam, and "web bugsien's computer. *Id.* at 3-4. Increased
27         costs of anti-spam software are "passed on as increased charges to
           consumers .... [and] some observers expect that free e-mail services ...
28         will be downsized." *Id.* at 6. The Committee also noted that

25

1

2

3

4

> "[a]lthough Internet access through broadband connections is steadily growing, a dial-up modem continues to be the method by which a vast majority of Americans access the Internet and their e-mail accounts." *Id.* at 7. The "per-minute" and long distance charges for Internet connections for many e-mail users were exacerbated by time spent on manual spam filtering, resulting in additional per-customer costs. *Id.*

5

6

7

8

> In subsequently describing the various enforcement provisions in the Act, the Committee discussed the private right of action provision at issue here, which would allow a provider of Internet access service adversely affected by a violation ... to bring a civil action.... This could include a service provider who carried unlawful spam over its facilities or who operated a website or online service from which recipient e-mail addresses were harvested in connection with a violation. . . .

9  *Id.* at *6. The court concluded that the "adverse effect" requirement is satisfied only if an IAS

10  alleges a particular type of harm and that harm is "significant." *Id.* at *8.

11  This Court finds the reasoning of *Gordon* to be sound. Further, having carefully reviewed

12  the evidence, the Court concludes that no reasonable jury could find, based on the undisputed

13  evidence, that the Emails that are the subject of this action caused any significant adverse effect to

14  ASIS. While there is some evidence that spam generally has imposed costs on ASIS over the years,

15  there is *no* evidence that the Emails at issue in this action resulted in adverse effects to ASIS: there is

16  *no* evidence in the record that any of the Emails either reached any active ASIS users (rather than

17  being filtered by Postini) or were the subject of complaints to ASIS; there is *no* evidence in the

18  record that ASIS had to increase its server capacity or experienced crashes as a result of the Emails;

19  and there is *no* evidence in the record that ASIS experienced higher costs for filtering by Postini as a

20  result of the Emails. Indeed, the monthly charge for filtering that Postini charged ASIS was

21  somewhat lower in the second half of 2005, when the Emails were sent, than in the first half of 2005.

22  In short, ASIS suffered no meaningful adverse effect as a result of the Emails of any kind. As a

23  result, it does not have standing to assert its claims under the CAN-SPAM Act.

24

25

26

27

28

United States District Court
For the Northern District of California

26

1          **2.     Whether Azoogle Procured the Emails**

2          Azoogle asserts, as an independent basis for summary judgment, that there is no evidence

3  from which a jury could reasonably conclude that it "procured" the Emails as that term is used in the

4  CAN-SPAM Act. The Court agrees.

5          Sections 7704(a) and (b) of the CAN-SPAM Act prohibit the "initiation" of certain types of

6  deceptive or misleading commercial email messages. 15 U.S.C. § 7704(a) & (b). Section 7702(9)

7  defines "initiation" as follows:

8                  The term 'initiate", when used with respect to a commercial electronic
                   mail message, means to originate or transmit such message or to
9                  procure the origination or transmission of such message, but shall not
                   include actions that constitute routine conveyance of such message.
10                 For purposes of this paragraph, more than one person may be
                   considered to have initiated a message.
11

12  15 U.S.C. § 7702(9). The term "procure," in turn, is defined generally to mean "intentionally to pay

13  or provide other consideration to, or induce, another person to initiate such a message on one's

14  behalf." 15 U.S.C. § 7702(12). A special definition, however, is provided where the action is

15  brought by an IAS. 15 U.S.C. § 7706(g)(2). In particular, section 7706(g)(2) provides as follows:

16                 In any action brought under paragraph (1), this chapter shall be applied
                   as if the definition of the term "procure" in section 7702(12) of this
17                 title contained, after 'behalf' the words "with actual knowledge, or by
                   consciously avoiding knowing, whether such person is engaging, or
18                 will engage, in a pattern or practice that violates this chapter."

19  15 U.S.C. § 7706(g)(2).

20          Neither party has cited to any case law that provides meaningful guidance as to the conscious

21  avoidance standard in the context of the CAN-SPAM Act, and the court has found none. Therefore,

22  the Court looks for guidance to the doctrine of conscious avoidance that has been applied in criminal

23  law. In criminal law, the doctrine of conscious avoidance has been defined as follows:

24                 [w]hen knowledge of the existence of a particular fact is an element of
                   an offense, such knowledge is established if a person is aware of a
25                 high probability of its existence, unless he actually believes it does not
                   exist.
26

27  *United States v. Netkalov*, 461 F.3d 309, 314 (2d Cir. 2006) (quoting *Leary v. United States*, 395

28  U.S. 6, 46 n. 93 (1969)). The court in *Netkalov* explained, "essential to the concept of conscious

27

United States District Court
For the Northern District of California

1    avoidance [is] that the defendant must be shown to have decided not to learn the key fact, not merely
2    to have failed to learn it through negligence." *Id.* (quoting *United States v. Rodriguez*, 983 F.2d 455,
3    458 (2d Cir. 1993). The court continued, "a court can properly find wilful blindness only where it
4    can almost be said that the defendant actually knew. He suspected the fact; he realized its
5    probability; but he refrained from obtaining the final confirmation because he wanted in the event to
6    be able to deny knowledge." *Id.*

7       A separate question is what "fact" the defendant must have consciously avoided knowing.
8    Azoogle asserts that the defendant must have consciously avoided knowing that the particular
9    individual or entity that sent the spam would do so. Azoogle cites to *Hypertech* in support of this
10    assertion, quoting the court's statement in that case that the plaintiff had "failed to provide any
11    evidence that [the defendant] had actual knowledge or consciously avoided knowing of a current or
12    future violation of the CAN-SPAM Act by anyone who sent the emails at issue." 2006 WL 648688
13    (N.D. Cal. March 8, 2006) at * 5. ASIS argues that a defendant need not have specific knowledge of
14    the identity of the individual sending the spam to meet the "conscious avoidance" standard. The
15    Court agrees with ASIS.

16       First, Azoogle's reliance on *Hypertouch* is misplaced. The *Hypertouch* court did not
17    directly address whether conscious avoidance might be established, even where the defendant knew
18    nothing about a specific spammer, on the basis that the defendant consciously avoided knowing its
19    agent was procuring the transmission of spam by third parties on the its behalf. Indeed, the court
20    implied that "refusal to investigate" whether its agent was paying third parties to send spam on its
21    behalf *would* be a CAN-SPAM violation but found no evidence that defendants had engaged in such
22    conduct. *Id.* Second, it is evident from the plain language of the CAN-SPAM Act that an entity that
23    consciously avoided knowing that its agent was paying others to send spam on its behalf – even if it
24    had no knowledge of who was being paid to send the spam – would meet the special definition of
25    "procure" discussed above. This is because the agent, by paying others to send email on *its* behalf
26    would be engaging in a pattern and practice of violating the CAN-SPAM Act. Thus, the special
27    definition in § 7706(g)(2) would be satisfied.

28

1       The Court nevertheless finds that Plaintiff has failed to point to evidence sufficient to
2  establish a jury question as to whether Azoogle "procured" the Emails at issue in this case under the
3  definition discussed above. Although ASIS has pointed to significant evidence that Azoogle, during
4  the relevant time period, did little to investigate the third party vendors it engaged, there is no
5  evidence in the record from which a jury could conclude that Azoogle, in contracting with Seamless
6  Media, made a deliberate choice not to know that Seamless Media would engage third parties to
7  send out spam on Azoogle's behalf. The evidence cited by ASIS to establish knowledge on
8  Azoogle's part is entirely speculative. Even assuming it is true that the Emails were sent by a single
9  individual and that the lead was typed into a web site that was copied from Azoogle's
10  lowrateadvisors site, this is insufficient to show that Azoogle consciously avoided knowing that the
11  Emails would be sent. Further, while ASIS relies primarily on the allegation that Azoogle failed to
12  adequately investigate its third-party vendors, ASIS has pointed to no evidence that if Azoogle *had*
13  investigated Seamless Media prior to entering into the Insertion Order, it would have learned facts
14  sufficient to show that Seamless Media was likely to engage in CAN-SPAM violations. There is no
15  evidence in the record that would put Azoogle on notice that Seamless Media, or Seamless Media's
16  vendors, obtained leads from spammers. Indeed, the only evidence on this subject is that Seamless
17  Media had a good reputation at the time, and was obliged by its contract with Azoogle to follow the
18  law.

19      Accordingly, the Court grants summary judgment in favor of Azoogle on the CAN-SPAM
20  Act claim.

21      **C.      The Cal. Bus. & Prof. Code § 17529.5 Claim**

22      The Court also finds that Plaintiff's state law claim fails. Under California law, it is unlawful
23  for an entity to "advertise" in a commercial email under certain circumstances. Cal. Bus. & Prof.
24  Code § 17529.5(a). Azoogle did not send the offending spam. Nor did it knowingly "procure" the
25  spam, as discussed above. At most, Azoogle may have benefitted from the spam (although even on
26  this point, the evidence is scant). ASIS has cited to no California case law that suggests that a
27  defendant that did not itself send spam advertising and did not knowingly commission another entity
28  to send spam advertisements could be held liable under state law merely because it benefitted from

29

1   the spam. Indeed, to the extent a state law permitted the imposition of liability on such a basis it

2   would not fall within the savings clause of the CAN-SPAM Act, which permits state law to regulate

3   the use of electronic messages only to the extent those regulations are based on traditional principles

4   of fraud. *See Kleffman v. Vonage Holdings Corp.*, 2007 WL 1518650 (C.D. Cal. May 23, 2007).

5   Because the Court concludes that no reasonable jury could find that Azoogle "advertised" on the

6   current record, Plaintiff's state law claim also fails.

7   **IV.   CONCLUSION**

8        For the reasons stated above, Defendant's Motion is GRANTED on the basis that: 1)  ASIS

9   lacks standing to assert a CAN-SPAM Act claim against Azoogle; 2) Azoogle did not "procure" the

10  Emails that are the subject of this action under the CAN-SPAM Act; and 3) Azoogle did not

11  "advertise" for the purposes of Plaintiff's state law claim. Accordingly, Plaintiff's claims against

12  Azoogle are dismissed with prejudice.

13       IT IS SO ORDERED.

14

15  Dated: March 27, 2008

16                                          JOSEPH C. SPERO
                                            United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California